*Decision will be entered under Rule 50.*

ESTATE OF SALLIE HOUSTON HENRY, DECEASED, CHARLES J. BIDDLE AND GERALD RONON, EXECUTORS, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 109972. Promulgated December 7, 1944.

*Henry S. Drinker, Esq., Richard K. Stevens, Esq.,* and *John W. Bodine, Esq., Frederick E. S. Morrison, Esq.,* and *Andrew B. Young, Esq.,* for the petitioners.

*Brooks Fullerton, Esq.,* for the respondent.

430

432

434

## OPINION.

Mellott, *Judge*: The first two issues involve essentially the same questions—the effect, for estate tax purposes, of the deed of family settlement of 1915, the deed of confirmation of 1922, the annual approvals, the Orphans' Court proceedings, the 1935 income tax case, and especially the failure of the last grandchild (Eleanor Houston Smith) to sign the deed of family settlement prior to the effective date of the Joint Resolution of March 3, 1931.

Of these questions the most important is the effect of the deed of family settlement (sometimes hereinafter referred to as the deed of 1915). The deed of confirmation of 1922 (sometimes referred to hereinafter as the deed of 1922) was largely confirmatory of the deed of 1915 and, together with the approvals signed by Samuel, Gertrude, and the decedent (hereinafter referred to as the three life tenants), brought within the terms of the deed of 1915 the Standard Oil stock dividends and stock rights distributed after December 31, 1915. The non-Standard Oil securities were held in principal by Houston's trustees by reason of the approvals of the three life tenants—possibly also by reason of oral agreements made by them.[5] We shall discuss first the effect of the deed of 1915, as confirmed by the deed of 1922.

Respondent contends that under the provisions of the deed of 1915 (and also the deed of 1922) no property rights of the decedent passed to the trustees when it was signed and executed by the three life tenants and the grandchildren who had then attained their majority; that acceptance by all the grandchildren was a condition precedent to the transfer of such property rights; that the condition was not fulfilled and the property rights were not transferred until the last grandchild, Eleanor Houston Smith, signed the deed shortly after attaining her majority on July 21, 1931; that the decedent (being one of the three life tenants) retained for life the cash income to be derived from the property which she transferred; and, therefore, that the value of the property transferred by her was properly included in her gross estate under sections 302 (a) and (c) of the Revenue Act of 1926, as amended by the Joint Resolution of March 3, 1931, and subsequent revenue acts.[6] For present purposes the value determined by

[5] The Orphans' Court, in its adjudication upon the trustees' first account, filed October 8, 1941 (Ex. 29—A. C.), held that "oral agreements" had been made by the life tenants that the dividends on corporate securities other than those of the Standard Oil Co. should be held by the trustees of Houston's estate as principal. It said: "By the oral agreements * * * and the repeated affirmation of such agreements found in the approval of the various accounts the life tenants released to the principal of tthe trust any claims to stock dividends and other extraordinary corporate distributions to which they might be entitled as the income beneficiaries of the trust. When made, this release was irrevocable and could not be set aside or revoked without the consent of all remainder interests which were benefited by such release."

[6] SEC. 302 [as amended by section 404 of the Revenue Act of 1934]. The value of the gross estate of the decedent shall be determined by including the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated, except real property situated outside the United States—

(a) To the extent of the interest therein of the decedent at the time of his death; * * *

* * * * * * * *

(c) [as amended by Joint Resolution of March 3, 1931, Public No. 131, Seventy-first Congress, and by section 803 (a) of the Revenue Act of 1932]. To the extent of any interest therein of which the decedent has at any time made a transfer, by trust or otherwise, in contemplation of or intended to take effect in possession or enjoyment at or after his death or of which he has at any time made a transfer, by trust or otherwise, under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death (1) the possession or enjoyment of, or the right to the income from, the property, or (2) the right, either alone

the Commissioner (findings 34 and 35) will be assumed to be correct.

Petitioners contend that the decedent's rights in the "Standard Oil Securities" were irrevocably transferred in trust prior to the Joint Resolution of March 3, 1931, subject to a condition subsequent, and, since the joint resolution was not retroactive, the value thereof is not subject of the estate tax upon decedent's death; that the rights of the decedent and her brother and sister in the "Standard Oil Securities" described in the deed of family settlement passed to the trustees of the Henry H. Houston estate upon the signing of the deed by them in 1915; and that at no time after 1915 did they have the right, either by themselves or in conjunction with anyone else, to abrogate the deed and get back the rights assigned merely because all the grandchildren who might become of age had not become of age and signed it. They argue that the phrase providing that the life tenants shall be "restored in their rights, whatever they may be," if "at any time in the future

---

or in conjunction with any person. to designate the persons who shall possess or enjoy the property or the income therefrom ; except in case of a bona fide sale for an adequate and full consideration in money or money's worth. Any transfer of a material part of his property in the nature of a final disposition or distribution thereof, made by the decedent within two years prior to his death without such consideration, shall, unless shown to the contrary, be deemed to have been made in contemplation of death within the meaning of this title;

(d) [As amended by section 401 of the Revenue Act of 1934, and by section 805 (a) of the Revenue Act of 1936.]   (1) To the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, where the enjoyment thereof was subject at the date of his death to any change through the exercise of a power (in whatever capacity exercisable) by the decedent alone or by the decedent in conjunction with any other person (without regard to when or from what source the decedent acquired such power), to alter, amend, revoke, or terminate, or where any such power is relinquished in contemplation of decedent's death.

(2) For the purposes of this subdivision the power to alter, amend, or revoke shall be considered to exist on the date of the decedent's death even though the exercise of the power is subject to a precedent giving of notice or even though the alteration, amendment, or revocation takes effect only on the expiration of a stated period after the exercise of the power, whether or not on or before the date of the decedent's death notice has been given or the power has been exercised.   In such cases proper adjustment shall be made representing the interests which would have been excluded from the power if the decedent had lived, and for such purpose if the notice has not been given or the power has not been exercised on or before the date of his death, such notice shall be considered to have been given, or the power exercised, on the date of his death.

(3) The relinquishment of any such power, not admitted or shown to have been in contemplation of the decedent's death, made within two years prior to his death without such a consideration and affecting the interest or interests (whether arising from one or more transfers or the creation of one or more trusts) of any one beneficiary of a value or aggregate value. at the time of such death, in excess of $5,000. then. to the extent of such excess. such relinquishment or relinquishments shall. unless shown to the contrary, be deemed to have been made in contemplation of death within the meaning of this title:   *   *   *

*      *      *      *      *      *      *

(1) If any one of the transfers, trusts, interests, rights, or powers, enumerated and described in subdivisions (c), (d), and (f) of this section is made, created, exercised, or relinquished for a consideration in money or money's worth, but is not a bona fide sale for an adequate and full consideration in money or money's worth, there shall be included in the gross estate only the excess of the fair market value at the time of death of the property otherwise to be included on account of such transaction, over the value of the consideration received therefor by the decedent.

any one or more" of the grandchildren should not be willing "to become signatories" and acquiesce in the disposition of the Standard Oil securities in the manner specified in the deed, is consistent only with a condition subsequent; that the ultimate signature of the deed by all the minor grandchildren was not necessary to make the deed binding upon the three life tenants; that any such construction is impossible in view of the fact that all the parties to the deed have treated it as valid and binding from the date of its execution and the Orphans' Court has held it to be binding; and that the only reasonable construction of the deed is that "it was an absolute transfer and agreement, binding upon each of the parties who signed it at the moment when they respectively signed it, subject to abrogation in the event that in the future any grandchild, on coming of age, affirmatively refused to sign it."

In *May* v. *Heiner*, 281 U. S. 238, it was held that retention by the grantor of the income for life of an irrevocable trust does not justify the inclusion of the corpus of the trust in the estate of the grantor for purposes of the estate tax. Congress undertook to devitalize this decision shortly after its promulgation by the Joint Resolution of March 3, 1931, specifically including in gross estate a transfer under which the transferor has retained for his life, or for any period not ending before his death, the possession or enjoyment of, or the income from the property, or the right to designate the persons who shall possess or enjoy the property or the income therefrom, except in case of a bona fide sale for an adequate and full consideration. The joint resolution, however, is not to be applied retroactively, *Hassett* v. *Welch*, 303 U. S. 303.

It is not clear whether respondent, at the time the deficiency was determined, was relying upon the view expressed by this tribunal in *Estate of Mary H. Hughes*, 44 B. T. A. 1196, to the effect that *May* v. *Heiner* had been overruled by *Helvering* v. *Hallock*, 309 U. S. 106. The *Hughes* case, however, was specifically overruled before the hearing in the instant case, *Estate of Edward E. Bradley*, 1 T. C. 518; affirmed *sub nom. Helvering* v. *Washington Trust Co.*, 140 Fed. (2d) 87. Acquiescence by the respondent in the view expressed in the *Bradley* case is implicit in the postulate adopted by him upon brief— i. e., that decedent's share of the extraordinary distributions is includible in her gross estate because no actual transfer of them had been made by her prior to the signing of the deed of family settlement by Eleanor Houston Smith, which occurred shortly after July 21, 1931. Any inconsistency in the position taken by him is immaterial; for his determination must be upheld, if justified by the facts, notwithstanding the reason for making it may be unsound. *Edgar M. Carnrick*, 21 B. T. A. 12; *Sand Springs Ry. Co.*, 31 B. T. A. 392; *Standard Oil*

438

*Co.*, 43 B. T. A. 973; affd., 129 Fed. (2d) 363; certiorari denied, 317 U. S. 688.

For reasons which will become apparent later the effect of the deeds upon the Standard Oil Co. securities will be considered first. There is no dispute that the decedent transferred all of her property rights in these securities to the trustees, reserving for her lifetime the income therefrom. The question is whether this transfer was completed prior to the Joint Resolution of March 3, 1931, or shortly after July 21. 1931, when the last grandchild became of age and signed the deed of family settlement. If the latter, then the value of decedent's rights in these securities must be included in her gross estate.

It is apparent, and the parties agree, that the assignment by the life tenants, in the deed of 1915, of all their right, title, and interest in the Standard Oil distributions was coupled with a condition in the same instrument. The decision turns, therefore, largely on whether the condition was precedent or subsequent to the vesting of the property.

Estates on condition are well known to the law and an extended discussion here is not required. However, it may be helpful to note. briefly, the nature and operation of conditions precedent and conditions subsequent.

An estate on condition may be defined as an estate which is subject, as regards its commencement or possible termination, to the occurrence of an event or the doing of an act. It is an estate on "condition precedent" if it is not to commence or "vest" until the occurrence of the event or the doing of the act. If it is to terminate on the happening of a specified event or the doing of an act at the option of the creator of the estate or of his successor in interest, before its normal time of termination. it is an estate on "condition subsequent." Tiffany, Real Property, 3d ed., vol. 1, sec. 185. While certain words are said to be appropriate for the creation of a condition. no particular words are required. The polestar for determining whether a condition exists and whether it is precedent or subsequent is the intention of the grantor as gathered from the whole instrument. *Stanley* v. *Colt*, 5 Wall. 119, 166; *In re Lindy-Friedman Clothing Co.*, 275 Fed. 453. A reservation of the right of reentry in a particular event will usually render the estate one on condition subsequent, *Kew* v. *Trainor* (Ill.), 37 N. E. 223; *Dunne* v. *Minsor* (Ill.), 143 N. E. 842, as will a provision that in a particular event the property shall revert to the grantor, *Johnston* v. *City of Los Angeles*, 168 Pac. 1047; *Village of Peoria Heights* v. *Keithley* (Ill.), 132 N. E. 532; *Powell* v. *Powell* (Ill.), 167 N. E. 802; or a provision that the instrument shall become void. *Dunne* v. *Minsor, supra; Randall* v. *Wentworth* (Me.), 60 Atl. 871; *Minneapolis Threshing Machine Co.* v. *Hanson* (Minn.), 112 N. W. 217. Such expressions indicate that the grantee has taken possession, or that the property has passed, or that the conveyance was valid.

A condition precedent operates to cause an estate to come into existence or to defer the commencement of an estate until compliance therewith. There is actually no estate so long as the condition precedent exists but merely the prospect or possibility of an estate, Tiffany, Real Property, 3d ed., vol. 1, sec. 186. When the condition happens the estate arises, freed from the condition; and it is not different from a similar estate which was immediately created. In the case of a condition subsequent, however, the grantee takes an estate which is liable to termination on breach of the condition; but until such termination he has the same rights and powers as if the condition did not exist. Moreover, such an estate does not end automatically on breach of the condition, but, "on the contrary, it is cut short or divested, if, but only if, the person having the power chooses to exercise it." Restatement, Property, vol. 1, sec. 24 and comment b. Finally, "the courts tend to construe a condition as subsequent, rather than precedent, so as to give the grantee or devisee an estate liable to be divested, rather than to defer the vesting." Tiffany, Real Property, 3d ed., vol. 1, sec. 194.

An examination of the deed of 1915 convinces us it was the intention of the parties that the assignment of the Standard Oil distributions should become effective immediately and that all of the property rights of the assignors should then and there be transferred to the trustees of Houston's estate. Questions had arisen concerning the three life tenants' rights in the securities. The trustees of Houston's estate, from the beginning, had added to the corpus of the estate stock dividends of the Standard Oil Co. which, under the laws of Pennsylvania, were distributable to the life beneficiaries. Houston's widow, Sallie, one of the life beneficiaries, had died in 1913 leaving a will which had provided for an unequal distribution of her residuary estate among her grandchildren. The will had been questioned and the residuary clause pronounced void, by eminent attorneys, as violating the rule against perpetuities. If a contest had ensued and the opinion of the attorneys had been sustained, the entire residuary estate would have gone to Sallie's surviving children, thus cutting off the grandchildren. In this situation the deed of family settlement was entered into for the expressed purpose "to forever settle and determine * * * all questions of every kind and character * * * as to the present and future holding and disposition" of the Standard Oil securities and the residuary estate of Sallie.

The opening paragraph of the deed recites that it is: "By and between such of the children and grandchildren * * * of Henry H. Houston and Sallie S. Houston * * * who are signatories hereto, and such of the grandchildren * * * as have not yet attained their respective majorities and who may become signatories hereafter to this instrument, Parties of the First Part" and "The Real Estate Trust

Company of Philadelphia" as trustee under the Houston will and executor and trustee under Sallie's will, parties of the second part. Paragraph 5 specifically provides "That no person * * * shall take any interest under this instrument, or shall have any claim, or shall have the right to make any claim under the same," unless he "become a party signatory thereto, or barred thereby." Clearly it was the intention of the parties, as expressed in the instrument, that each grandchild as he became of age should surrender, by signature, all of his rights under his grandmother's will in consideration for his rights under the deed of family agreement. The failure or refusal of any grandchild to sign would not invalidate the deed or affect it in any way. Such failure or refusal would only put it in the power of the signatories thereto to *elect* to be "restored" in their rights * * * to such legal situation as "existed" with reference to the Standard Oil securities "as though this instrument had never been executed." The use of the words "restored" and "existed" in section 6 of the deed is, in our judgment, inconsistent with an intention to retain the property until the last grandchild had signed the deed.

The intention of the decedent to make a present transfer of her property in the securities is further evidenced by the disposing clause of the "First" paragraph of the deed, in which the life tenants and "the other signatories to this agreement" made an irrevocable assignment of all their right, title, and interest in the securities and in Sallie S. Houston's residuary estate; also by the "Second" paragraph, in which the trustee of the Houston estate is directed to hold the securities until the termination of the deed of family settlement in accordance with its terms and "in the meantime" to dispose of the income and finally to distribute the principal thereof as directed in the deed. If further evidence of intention is necessary it is found in paragraph 6, where it is provided that in the event the settlors shall be restored in their rights they may have the right to require from the executors and trustees of both estates an accounting for such securities and assets, "subject to such interim distribution of income or principal as may have been made by such executors and trustees as authorized hereunder." Moreover, the deed was always treated by the parties as being effective when signed in 1915. From that time until the death of the decedent its provisions were carried out and distributions were made according to its terms.

Finally, it may be pointed out that paragraph 6 of the deed of 1915 is inconsistent with the notion of a condition precedent because, upon the refusal of any grandchild to sign the deed, the settlors have an election to take advantage of such action or to ignore it. This is consistent only with a condition subsequent.

The deed was complete and irrevocable as to all signatories when signed by them. The provision requiring grandchildren on coming

of age in the future to sign the agreement in order to become beneficiaries thereunder was for their benefit and not a condition precedent to the vesting of the property. Prior to the Joint Resolution of March 3, 1931, the decedent had unconditionally disposed of all her right, title, and interest in the Standard Oil securities. She did not reserve any power, either alone or in conjunction with any person, to change, alter, or revoke such disposition, and did not have such power either on March 3, 1931, or at any time thereafter.

It is true that on March 3, 1931, there was a possibility, extremely remote, that Eleanor Houston Smith, the only living grandchild who had not signed, would (contrary to her own interest), on coming of age, refuse to sign the agreement of 1915, thus putting it in the power of the decedent to recover the assigned rights in the Standard Oil securities. But this possibility existed, not by reason of any power reserved to the decedent-grantor, but because of an absolute and unlimited discretionary power lodged in the grandchild, the exercise of which could not be controlled by the grantor. Cf. *Hugh M. Beugler Trust*, 2 T. C. 1052 (on appeal to C. C. A., 2d Cir.) ; *Herzog* v. *Commissioner*, 116 Fed. (2d) 591. The possibility of obtaining a power in the future is not the equivalent of an actual power of revocation. It is no power at all unless and until the contingency occurs, and does not vest in the grantor the power to repossess the property. Cf. *John Edward Rovinsky*, 37 B. T. A. 702.

We are of the opinion that the provision of the deed of 1915 under which decedent might be restored to her rights in the Standard Oil securities was a condition subsequent; that decedent's property rights passed when she signed the deed; that the reservation of income did not make the transaction one to take effect in possession and enjoyment at or after death within the provisions of the Joint Resolution of March 3, 1931, *Hassett* v. *Welch, supra,* and that the Standard Oil securities are not includible in her gross estate.

The extraordinary distributions on securities other than those of the Standard Oil companies are in a different category. They were not referred to in, nor were they in our judgment affected by, the deed of family settlement (1915) or the deed of confirmation (1922). This was the view taken by the Orphans' Court in its adjudication, which is probably binding upon us. *Freuler* v. *Helvering*, 291 U. S. 35; *Blair* v. *Commissioner*, 300 U. S. 5; *Estate of Sallie Houston Henry*, 47 B. T. A. 843. The two types of securities have been kept separate throughout this proceeding, including the notice of deficiency, the stipulation of the parties, and the various exhibits. Apparently the only authorization ever given by decedent and her brother and sister to the trustees of Houston's estate under which the non-Standard Oil securities were held as principal consisted of oral agreements to that effect, buttressed by subsequent written annual approvals. No evi-

dence as to the oral agreements was adduced at the hearing before us, although such evidence seems to have been before the Orphans' Court. It held, as set out in footnote 5, that the life tenants, by the annual approvals, had released these securities to the principal of the trust and that the "release was irrevocable and could not be set aside or revoked without the consent of all remainder interests which were benefited by such release."

The "remainder interests which were benefited" were those specified in Houston's will. They included not only the grandchildren—the class referred to in the 1915 and 1922 deeds—but also "children of any deceased grand-child." In that view, taken by the Orphans' Court and in our judgment correctly so, the non-Standard Oil securities irrevocably passed from the decedent at or about the time they were received and became, for all purposes, part of the trust created by her father. Since there was no reservation of "possession or enjoyment of, or the right to the income from," this property, the Joint Resolution of March 3, 1931, is not applicable.

Respondent has assumed throughout his argument that the non-Standard Oil securities were included in and covered by the 1915 and 1922 deeds. In doing so we think he has erred. The question is important only in the event we have erred in reaching the conclusion expressed in the earlier part of this opinion. At the risk of unnecessarily extending this discussion, it may be pointed out that the 1915 deed referred only to the " 'Standard Oil Securities', * * * definitely mentioned in detail, which are now held undistributed in the possession of the Trustees of the Estate of Henry H. Houston, deceased, aggregating an approximate value of $14,000,000." The several paragraphs comprising the "premises" of the deed of 1915—i. e., preceding the habendum—and the schedules attached, refer only to the securities received about June 1, 1899, "from the Trustees of the Standard Oil Trust" and later exchanged for "Common Capital Stock of the Standard Oil Company of New Jersey," certificates of subsidiary companies of the Standard Oil Co. of New Jersey delivered to the trustees of Houston's estate on December 1, 1911, and stock dividends distributed by the Standard Oil subsidiary companies since December 1, 1911. Opinion had been requested from the attorneys, as recited in the deed "as to what portion, if any, of the said securities so received from the Standard Oil Company * * * constitute principal of such estate * * *." These were the only securities transferred by the 1915 deed. The 1922 deed is equally explicit in referring only to "the shares or securities representing or growing out of the testator's holdings of Standard Oil Trust Certificates * * *."

From what has been said it is apparent we are of the opinion respondent erred in including in gross estate the value of the ex-

traordinary distributions, received by Houston's trustees, upon the non-Standard Oil securities, and we so hold.

The facts in connection with the next issue—the amount to be included in gross estate under the trust created by decedent in 1916—are shown in findings 25 to 29 inclusive. Briefly, the income from the securities transferred in trust [7] is to be paid to the settlor's three children and their children until the death of all of the settlor's children, at which time the corpus is to be distributed, per capita, to the grandchildren then living, the issue of a deceased grandchild to take its parent's share. The clause providing for the distribution of the corpus is as follows:

In Trust, upon the death of all of said children of Grantor, to pay over and distribute the corpus or principal of the Trust herein and hereby created, together with all accumulations thereon and additions thereto, absolutely, unto the grandchildren of Grantor living at that time per capita and not per stirpes; provided, however, that should any grandchildren of Grantor have died before the date set for the distribution of the corpus or principal of this trust leaving issue him or her surviving, such issue of any deceased grandchildren of Grantor shall receive the share of said corpus or principal to which his, her or their parent would have been entitled if living, such issue of any deceased grandchildren of Grantor taking per stirpes and not per capita. AND PROVIDED FURTHER, HOWEVER, that should any of the appointees of any child or children of Grantor be living at such time, there shall be retained by Trustees a portion of principal sufficient to produce such annual income as the child or children of Grantor may have made payable to such appointee or appointees.

Respondent, claiming an increased deficiency in tax (sec. 871 (e), I. R. C.) contends that since the decedent had unconditionally given the life interests to her three children (hereinafter sometimes referred to as the life tenants) with remainder over to such of her grandchildren as should be living at the termination of the trust, a true reversion in her existed—no gift over having been made—the value of which, to be included in gross estate under section 302 (a), is the value of the corpus, less the life estates. In the alternative, he contends that section 302 (c), *supra*, justifies and requires the same result. His argument upon the valuation under section 302 (a) proceeds substantially as follows: The interest of the designated remaindermen in the corpus is contingent. The tax is imposed on the interest owned by decedent at her death. The interest of the remaindermen not being vested at the time of her death, decedent owned at that time and her estate still owns, the corpus of the trust except the life estates. Therefore, "the measure of the reduction of the corpus because of the life interests is the term of the last to survive of the settlor's two daughters except if the widow of the settlor's deceased son survive her husband's sisters, her life will be the measure of the reduction

[7] For present purposes the fair market value of the securities at the date of death is assumed to be the amount determined by the respondent, $5,110,710.82.

of the portion of the corpus retained to pay the income appointed to her."

Petitioners concede that whatever interest the decedent had in the corpus of the trust at the time of her death is to be included in gross estate under section 302 (a). They insist it is only "the fair value of the chance that the principal might revert to her estate, in case on the death of the survivor of her two daughters all her grandchildren and great-grandchildren were deceased." That is a nominal amount.

In our judgment it is unnecessary to enter into an extended discussion of the law of vested and contingent remainders. Even if it be true that the courts of Pennsylvania, where the trust was created, would construe the interests of the grandchildren and great-grandchildren to be contingent until the death of the life tenants,[8] it does not follow that the value of the interest of the decedent in the property at the time of her death is the difference between the total value of the corpus and the value of the life estates. Decedent, by the transfer in trust, irrevocably parted with the trust property and the income therefrom during the lives of her children. She also directed her trustee "to pay over and distribute the corpus * * * together with all accumulations * * *, absolutely * * *" to her grandchildren living at the time of the death of the life tenants. It can not be gainsaid that the grandchildren had a substantial interest in the corpus from their birth, which only their death prior to the death of the life tenants could terminate. The interest of the decedent at the time of her death and the present interest of her estate, whether characterized as a reverter, a possibility of reverter, or an inchoate right to become the beneficiary of a resulting trust,[9] was, realistically and practically, only to receive the corpus upon the complete failure of her whole line. We disagree with respondent's assertion that decedent "owned at the time of her death and her estate still owns" the corpus less the life estates.

Cases arising under section 302 (c), some of which have been cited and relied upon by the respondent, have not been found to be helpful because, as the Court pointed out in *Helvering* v. *Hallock*, 309 U. S. 106, that section "deals with property not technically passing at death but with interests theretofore created," whereas section 302 (a) deals

---

[8] *In re Rudy's Estate* (1898), 185 Pa. 359; 39 Atl. 968; *In re Fceney's Estate* (1928), 293 Pa. 273; 142 Atl. 284; *Commissioner* v. *Rosser* (C. C. A., 3d Cir., 1933), 64 Fed. (2d) 631; *Wheaton Coal Co.* v. *Harris* (1927), 288 Pa. 294; 135 Atl. 637; *Walker's Estate* (1923); 277 Pa. 444; 121 Atl. 318; *Riverside Trust Co.* v. *Twitchell* (1941), 342 Pa. 558; 20 Atl. (2d) 768; *Reed's Appeal* (1888), 118 Pa. 215; 11 Atl. 787; *Safe Deposit & Trust Co.* v. *Wood* (1902), ʙ01 Pa. 420; 50 Atl. 920; *Bilyeu's Estate* (1943), 364 Pa. 134; 29 Atl. (2d) 516.

[9] § 430, Restatement of the Law of Trusts states:

"Where the owner of property gratuitously transfers it upon a trust which is properly declared but which is fully performed without exhausting the trust estate, the trustee holds the surplus upon a resulting trust for the transferor or his estate, unless the transferor properly manifested an intention that no resulting trust of the surplus should arise."

only with the interest in property which passes at death. Nevertheless, some of the language used in *Commissioner* v. *Kellogg*, 119 Fed. (2d) 54, wherein the Circuit Court of Appeals for the Third Circuit had the question of the inclusion of property in the gross estate of a decedent under 302 (c), is apposite. In that case the trust indenture, after providing for life estates in the grantor and his wife, provided for remainder over to their children "now alive and then surviving" and for "one equal part" of the trust res "in respect of each of the said children who may theretofore have died," leaving husband, wife, or issue surviving. Concluding that the estates following the life estates were not vested, the court contrasted them with what their status would have been if the grantor had provided that those parts of the trust designated to go to the issue or spouse of a nonsurviving child of the grantor had been set over to surviving children, grandchildren or spouses. It said:

&ast; &ast; &ast; Under these circumstances the estates following the life estates in the grantor and his wife would have been vested estates. The grantor would have put the corpus of the trust beyond possibility of return to himself except upon the very remote contingency that he would survive the death of his wife, his children, his grandchildren, the next of kin of his children and his own next of kin. If he had survived all of the persons named, the trust corpus would have reverted to him upon the failure of the trust. Upon the estates set up by the indenture of the case at bar, if the grantor had survived his wife, his children, their respective spouses, and their issue, and his own next of kin, the corpus of the trust would have reverted to him likewise by reason of the failure of the trust. In either event the trust would have returned to him not by specific words contained in the indenture, but by failure of the trust. Putting to one side any dialectic questions as to how a man can outlive his next of kin, it is obvious in the case at bar that *the grantor has no greater chance of recovering the corpus because the estates following the life estates are not vested than if they were.* [Italics ours.]

The value of the interest of the decedent in the trust property at the time of her death is determined by ascertaining in terms of money what her interest would bring in the market. *United States* v. *Provident Trust Co.*, 291 U. S. 272. "Like all values, as the word is used by the law, it depends largely on more or less certain prophecies of the future, and the value is no less real at that time if later the prophecy turns out false than when it comes out true." *Ithaca Trust Co.* v. *United States*, 279 U. S. 151.

An intelligent bidder—"a willing buyer"—of such interest as the decedent had in the property at the time of her death would not attempt to apply "the recondite learning of ancient property law"[10] in fixing the price to be paid. He would measure the value of decedent's interest by the probability that the corpus would be returned to her or her estate upon the termination of the life estates. This depended upon the demise

---

[10] *Helvering* v. *Hallock,* 309 U. S. 106.

of all twelve of her grandchildren prior to the death of the survivor of her children, the life tenants. The probability that this would occur can be reasonably approximated through the use of mortality tables. They support the conclusion, which inevitably would be reached by the hypothetical buyer, that this probability was exceedingly remote and the value of decedent's interest in the trust property was nominal. Cf. *Estate of Flora W. Lasker*, 47 B. T. A. 172; affd., 141 Fed. (2d) 889. Our best judgment is that the amount to be included in the decedent's gross estate as the value of her interest is $8.20. This conclusion renders it unnecessary to determine the fair market value of the securities held by the trust.

Respondent's alternative contention that section 302 (c) requires the inclusion in gross estate of the value of the corpus less the value of the life estates is controlled by such cases as *Commissioner* v. *Kellogg*, *supra; Lloyd* v. *Commissioner*, 141 Fed. (2d) 758; *Estate of Mabel H. Houghton*, 2 T. C. 871; *Estate of Ellen P. C. Goodyear*, 2 T. C. 885; and *Frances Biddle Trust*, 3 T. C. 832 (on appeal, C. C. A., 3d Cir.). The facts in the cited cases were quite similar to those now before us. In each it was held that there was no transfer intended to take effect in possession or enjoyment at or after death. We reach the same conclusion in this case. The decedent's obvious intention when she made the transfer to the trust in 1916 was to make a complete disposition of the property. The trust indenture contained no provision for the disposition by will or otherwise of any part of the property that might be returned to her or to her estate. No power of appointment was reserved (cf. *Fidelity-Philadelphia Trust Co. (Stinson estate)* v. *Rothensies*, 142 Fed. (2d) 838) and no "string or tie" by which the property could be pulled back to her existed. "* * * We cannot say that decedent intended to make the gift incomplete until her death by studiously reserving through silent implication of law a minute chance of recapture." *Estate of Ellen P. C. Goodyear, supra.* Nothing may be included in gross estate under section 302 (c).

The next issue is the fair market value of decedent's undivided one-third interest in 20 parcels of real estate. Her brother and sister owned the other two thirds. Petitioners included in gross estate one-third of the presently stipulated fair market value of each tract, less 20 per centum.[11] Respondent determined that one-third of the aggregate, without any discount, should be included.

In *William R. Stewart, Jr.*, 31 B. T. A. 201, this tribunal held "from a consideration of all of the testimony" that decedent's undivided three-tenths interest in 30 parcels of real estate and his undivided one-third interest in 14 others "should be discounted to the extent of 15 percent of the mathematical equivalent of the admitted value of the entire par-

---

[11] $417,610 divided by 3=$139,203.33, 80% of which is $111,362.67.

cel." The opinions of the witnesses in that case ranged from an allowance of no discount—even a suggestion that the nuisance value of a minority interest might justify a premium—to a discount of 40 percent.

In the instant case three witnesses called by petitioners, experienced in appraising real estate in the Philadelphia area, agreed that a discount factor of 20 percent would be reasonable. They rested their conclusion upon the difficulty of marketing an undivided interest, the disadvantages of owning real estate jointly with others, the possibility that a partition suit might be necessary with its attendant delay and expense, and the fact that some of the parcels were unproductive. Respondent points out that none of the witnesses had made any real appraisal of the parcels to be evaluated and that each was merely describing the "yard-stick" to be used. Also that no circumstances, such as disagreement between the co-owners or likelihood that a purchaser would be unable to get along with the other owners has been shown. While respondent's criticism of the testimony is partially justified, we do not agree with his contention that it should be wholly disregarded.

Valuation of real estate, like many questions of fact, can never be completely rationalized. We agree with petitioners and their witnesses that minority fractional interests in highly improved downtown property—most of the examples given by the witnesses were of this type—will, in forced sales, seldom bring an amount equal to an aliquot part of the value of the whole. But the real estate giving rise to the present issue is not of that type. The most valuable tract ($175,000) is the Philadelphia Cricket Club, comprising 18 acres bounded by Willow Grove Avenue, Hartwell Avenue, and Towanda and Huron Streets. Several of the others are vacant lots contiguous to the club property. The next most valuable ($50,000) is a 40-acre farm, three-quarters of a mile west of Ridge Avenue, Whitemarsh Township, adjoining other golf links. A third, having a value of $46,500, consists of 30.9 acres—457 lots—adjoining other land owned by the Houston estate. There is no evidence that these tracts were not readily divisible in kind. The parcels containing houses, representing only a small portion of the whole value, are more subject to the infirmities described by the witnesses. All of these circumstances, as well as the testimony of the witnesses and the arguments of counsel, have been considered in fixing the value determined, i. e., $125,000 rather than $139,203.33, as determined by respondent, or $111,362.67, as reported by petitioners.

The last issue is not discussed by the petitioners. Respondent states the question thus: Can a refund result from a claim made for the first time in an amended petition filed more than three years after the payment of any tax?

Briefly summarizing the facts, petitioners, by paragraphs 4 (f) and 5 (f) of the amended petition, filed October 12, 1943—which is more

than three years after the payment of the tax on September 5, 1939—make claim for the deduction of administration expenses, including counsel fees, in addition to those claimed in the estate tax return. No contention that such amounts were deductible was made in the original petition, which was filed less than three years after the payment of the tax, and no formal claim for refund has been filed. Respondent concedes that the amounts, aggregating $100,522 and shown in paragraph 26 of the stipulation, are otherwise proper deductions.

The applicable statute is shown in the margin.[12] Respondent assumes, and we think correctly, that the three-year period mentioned in the parenthetical clause is the applicable period. Thus, since no claim has been filed, no refund of any portion of the tax may be made unless we determine that such portion was paid within three years before the filing of the petition.

In *Edward E. Rieck*, 35 B. T. A. 1178, we took the view that an amended petition, assigning an error not assigned in the original petition, related back and became effective as of the date of the filing of the original petition. Under facts essentially the same as those now before us, we determined an overpayment. The cited case was followed in an unpublished memorandum opinion. The Circuit Court of Appeals for the Third Circuit reversed the *Rieck* case, *Commissioner* v. *Rieck*, 104 Fed. (2d) 294, and the Circuit Court of Appeals for the Second Circuit reversed the other. *Commissioner* v. *Dallas'*
*Estate*, 110 Fed. (2d) 743. Certiorari was denied in the *Rieck* case, 308 U. S. 602, and rehearing was denied, 310 U. S. 657. We announced adherence to the view of the courts in *Denholm & McKay Co.*, 41 B. T. A. 986. The last mentioned case was reversed upon a point of procedure under our rules (132 Fed. (2d) 243). *Denholm & McKay Co.*, *Commissioner* v. *Rieck*, and *Commissioner* v. *Dallas' Estate* were followed in *Adolph B. Spreckels*, 41 B. T. A. 1204. This case was reversed, *Spreckels* v. *Commissioner*, 119 Fed. (2d) 667; 315 U. S. 626, upon the question whether sales commissions were deductible, neither court deeming it necessary to determine whether the refund claim for 1934, in connection with which the cases were cited, was timely. See also *Producers Oil Corporation*, 43 B. T. A. 9; *Lois E. Scott*, 2 T. C.

[12] Sec. 319 (c) of the Revenue Act of 1926, as amended by sec. 809 (e) of the Revenue Act of 1938:

"If the Board finds that there is no deficiency and further finds that the executor has made an overpayment of tax, the Board shall have jurisdiction to determine the amount of such overpayment, and such amount shall, when the decision of the Board has become final, be credited or refunded to the executor as provided in section 3220 of the Revised Statutes as amended. No such refund shall be made of any portion of the tax unless the Board determines as part of its decision that such portion was paid within four years (or, in the case of a tax imposed by this title [i. e. by Title III of the Revenue Act of 1926, Estate Tax], within three years) before the filing of the claim or the filing of the petition, whichever is earlier, or that such portion was paid after the mailing of the notice of deficiency ; * * *"

726; *Mesta* v. *United States*, 137 Fed. (2d) 426; § 50.44, Mertens Law of Federal Income Taxation.

The cited authorities support respondent's contention. For good discussions of the other view, see dissenting opinions in *Commissioner* v. *Dallas* and *Denholm & McKay Co.*, *supra*. The question stated at the outset of the discussion of this issue must be answered in the negative.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

MURDOCK, SMITH, LEECH, and OPPER, *JJ.*, concur only in the result.