Estate of Samuel Want, Deceased, Fannye M. Want, Executrix, and Estelle Want, Trustees and Transferees, et al.,[1] Petitioners, *v.* Commissioner of Internal Revenue, Respondent.

Docket Nos. 36355, 45461–45465. Filed March 31, 1958.

---

[1] Proceedings of the following petitioners are consolidated herewith: Estate of Samuel Want, Deceased, Fannye M. Want, Executrix, Docket No. 45461; Estate of Jacob A. Want, Deceased, Samuel Want, Executor, and Estelle Want, Executrix, Docket No. 45462; Estelle Want, Docket No. 45463; Estate of Samuel Want, Deceased, Fannye M. Want, Executrix, and Estelle Want, Trustees and Beneficiaries, Docket No. 45464; Estate of Samuel Want, Deceased, Fannye M. Want, Executrix, and Estelle Want, Trustees and Transferees, Docket No. 45465.

1224

*George D. Webster, Esq.,*[2] and *Kenneth H. Liles, Esq.,*[3] for the petitioners.

*Paul E. Waring, Esq.,* for the respondent.

---

[2] Counsel for Estelle Want.
[3] Counsel for Estate of Samuel Want and Estate of Jacob A. Want.

1232

KERN, *Judge:* Petitioners' first contention is that the decision of the South Carolina court entered December 3, 1956, in the proceeding described in some detail in our Findings of Fact has made the issues before us res judicata and requires a decision of them by us in petitioners' favor. This contention is without merit.

This Court is concerned with the determination of the correct Federal tax liability of taxpayers properly invoking its jurisdiction. It is not concerned with problems incident to the collection of Federal taxes. The South Carolina court was concerned with the distribution of the funds of the Estate of Samuel Want, which were being administered under the jurisdiction of that State. Although it held that it had jurisdiction to pass upon the validity of claims against Samuel Want arising out of the Federal gift and estate tax liability of Jacob and his estate and directed the United States to assert those claims upon pain of being "barred and foreclosed of all right and claim against the funds of said estate," the United States did not present such claims before the State court for its adjudication, and the State court did not purport to adjudge the validity or amount of those Federal tax liabilities. The adjudication of the State court related only to the administration of the funds of Samuel Want within its jurisdiction. Its decision was that without regard to the merits of the claims predicated on the Federal gift and estate tax liability of Jacob and his estate they should not be entitled to participate in the funds of Samuel's Estate within its jurisdiction, since they had not been proved and allowed, either "forever" according to the first order of the State court or "unless and until the claims * * * approved and allowed have been paid in full" according to the second order of that court. It is thus apparent that the adjudication of the State court related only to the collection of these claims from a particular fund (a matter beyond the realm of our concern), and did not relate to the validity or extent of those claims.

It is unnecessary for us to express our opinion as to whether the State court erred in its conclusion that it had jurisdiction to decide the validity and extent of the deficiencies in Federal gift and estate taxes already at issue in proper proceedings pending in this Court, a matter which we understand is now on appeal. While the State court, as we have pointed out, held that it had such jurisdiction and directed that such claims should be filed in the proceedings before it, these claims were not so filed by the United States, and the decision of the State court, whether considered as embodied in its first order or second order, did not purport to adjudicate the validity or extent of the claims, but merely adjudicated their participation in certain funds of Samuel's Estate.

We conclude that the issues presented herein were not rendered res judicata by any order or decision of the South Carolina court.

We next consider the question of whether the transfers made by the decedent to Jacqueline's trust in 1945 were properly included in petitioner's gross estate as transfers made in contemplation of death within the meaning of section 811 (c), I. R. C. 1939.

The words "in contemplation of death" have been construed by the Supreme Court in *United States* v. *Wells*, 283 U. S. 102, as meaning that the thought of death is "the impelling cause of the transfer." The opinion in that case also indicates that the thought of death must be the "controlling motive" or "compelling motive" or "dominant motive" or "inducing cause" of the transfer. As illustrating a purpose of transfer "associated with life, rather than with the distribution of property in anticipation of death," the Supreme Court in that opinion said:

It is common knowledge that a frequent inducement [to the making of gifts] is * * * to have children * * * independently established with competencies of their own, without being compelled to await the death of the donor and without particular consideration of that event. There may be the desire to recognize special needs or exigencies or to discharge moral obligations. The gratification of such desires may be a more compelling motive than any thought of death.

The main thrust of the respondent in the trial of these cases, with regard to the question of whether these transfers were includible in decedent's gross estate, was an attempt to prove by the physician who diagnosed decedent in the fall of 1944 (the only medical witness who testified) that she had informed decedent fully concerning the illness which was beginning to affect him and especially as to its fatal nature. In this attempt respondent failed. Contrary to the apparent expectation of respondent's counsel, the physician testified that she had not informed decedent as to the serious or fatal nature of his illness, but had merely advised him that he had "a sickness of the nerves." To the average layman 54 years old, as was decedent, the receipt of information from his physician that he had "a sickness of the nerves" might well have caused apprehensions on his part as to the continued normal use of his limbs and other physical members with a consequent impairment of his normal social and business life, but it would not, in our opinion, give rise to such a "thought of death" on the part of decedent, who is described in the record as pleasant, active, interested in many facets of life, sociable, and fond of many forms of entertainment, and apparently not given to morbid thoughts, as to constitute "a controlling motive prompting the disposition of property * * *." See *United States* v. *Wells, supra*.

The circumstances present in the instant proceedings indicate that at or about the time of the creation of Jacqueline's trust and the transfers to it here in question, the decedent had other pressing con-

cerns in addition to his possible concern over the potential effects of his "sickness of the nerves." His primary concern appears to have been for the welfare and financial security of his only child, Jacqueline, to whom he was devoted. It is apparent from the circumstances described in our findings that only a most callous person could have been insensitive to the problems besetting that child. In connection with his concern for Jacqueline, decedent may well have been troubled by his relations with Blossom Ost. Those relations are not made explicit in the record, but we do know that he was "obsessed" by her, that she made demands on him, and that he gave to her during 2 years cash, bonds, jewelry, clothing, and other property of a total value of approximately $50,000.[4] Decedent was not living with his wife. She was not the mother of Jacqueline and from the entire record it appears that her attitude toward Jacqueline would be far from friendly. In addition decedent must have been aware of the financial manipulations in connection with his business which led to the ultimate determination of large deficiencies in income tax, plus additions for fraud against him and his corporation as set forth in our findings. In 1945 decedent was a man of many worries, and they all related to matters which might adversely affect Jacqueline.

We conclude that the controlling and dominant motive of decedent in making the transfers here in question was to provide security for Jacqueline's support and welfare against the following dangers: (a) A possible serious impairment of decedent's physical activity and earning capacity by reason of his "sickness of the nerves," (b) a possible serious drain upon his financial resources resulting from the claims of or his own weakness with regard to Blossom Ost, (c) unformulated fears with regard to the possible demands and probable antagonism of his estranged wife, and (d) the financial troubles which might be anticipated as a result of his tax difficulties; and that the controlling and dominant motive of decedent in making the transfers was not the thought of death.

We, therefore, conclude that the transfers here in question were not made in contemplation of death.

Respondent's argument (which is mentioned in his brief but not pressed) that the gifts to the trust were transfers to take effect in possession or enjoyment at or after decedent's death is without merit, since it is apparent that the transfers were immediately effective.

Respondent devotes a few phrases of his brief filed herein to the proposition that these transfers are includible in decedent's gross estate under section 811 (d) of the Internal Revenue Code of 1939,

---

[4] These gifts were not included by respondent in the transfers determined to be in contemplation of death. We may assume therefore that they concededly "related to purposes associated with life."

the pertinent parts of which are set forth in the margin hereof.[5] That part of his brief reads as follows:

and since the decedent reserved the right to change the contingent beneficiaries of the trust at any time so long as he may live, and was also empowered to name a substitute trustee in the event of the death of one of the designated trustees, it follows that the transfers in trust for the benefit of Jacqueline are includible in the gross estate and are subject to federal estate tax under * * * section 811 (d) of the 1939 Internal Revenue Code.

No authorities for this proposition are cited. In his reply brief respondent makes no reference to this contention.

With regard to any such contention based upon the power of decedent to name a substitute trustee in the event of the death of one of the designated trustees, we have no hesitancy in deciding it against respondent. This was a contingent power, the condition for the existence of which (as distinguished from its exercise) was not fulfilled during decedent's life. *Estate of Cyrus C. Yawkey*, 12 T. C. 1164; *Helvering* v. *Tetzlaff*, 141 F. 2d 8; *Jennings* v. *Smith*, 161 F. 2d 74. See also *Estate of Sallie Houston Henry*, 4 T. C. 423, 441.

However, it does seem apparent that decedent retained a present power during his life of changing those beneficiaries whose rights were contingent upon the death of Jacqueline without issue prior to her 30th birthday and the death of decedent's wife. This power is a power to alter or amend within the meaning of section 811 (d). *Fanny M. Dravo, et al., Executors*, 40 B. T. A. 309. While not conceding this conclusion petitioners direct their principal argument on this question to the effect that since the only amount includible in decedent's gross estate on account of transfers to the trust would be the value of the contingent remainder interest subject to the power, and any actuarial valuation of these contingent remainders, even if such a valuation were possible, would result in a *de minimis* amount, it follows that no amount should be included in the gross estate.

We agree that only the value of the contingent remainder interest subject to the power is includible in the gross estate. *Estate of Albert E. Nettleton*, 4 T. C. 987, 993. See also *Fanny M. Dravo, et al., Executors, supra* at 325.

With regard to petitioners' argument that the contingent remainder interest subject to the power cannot be evaluated by actuarial science

---

[5] SEC. 811. GROSS ESTATE.

(d) REVOCABLE TRANSFERS.—

(1) TRANSFERS AFTER JUNE 22, 1936.—To the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, where the enjoyment thereof was subject at the date of his death to any change through the exercise of a power (in whatever capacity exercisable) by the decedent alone or by the decedent in conjunction with any other person (without regard to when or from what source the decedent acquired such power), to alter, amend, revoke, or terminate, or where any such power is relinquished in contemplation of decedent's death ;

(for which proposition they cite *Robinette* v. *Helvering*, 318 U. S. 184) and, even if such an evaluation were possible, that the value of such an interest would be a *de minimis* amount, we are greatly troubled by the state of the record herein. As we have pointed out, the main thrust of respondent's argument is that the transfers are includible in decedent's gross estate in their entirety as transfers in contemplation of death. While section 811 (d) is referred to in respondent's determination and, to the extent quoted, in his brief, there has been no determination as to the value of the contingent remainder interest subject to the power and no evidence was submitted by any of the parties with regard to its value or the possibility of its evaluation. A cursory examination of respondent's regulations suggests the strong probability that even though a valuation should consider only the simplest of the contingencies, i. e., that Jacqueline should die during decedent's life before attaining the age of 30 years, the value of the contingent interest, if any, would be considerably less than the full value of the trust corpus. Under the circumstances before us, we are unwilling to make a decision relying upon failure of proof or upon an actuarial guess. We conclude that the value, if any, of the contingent interest subject to decedent's power of designating beneficiaries is includible in his gross estate. We assume that the parties will agree upon its value in filing computations under Rule 50, but if this proves to be impossible we will, upon proper motion, reopen these proceedings for the purpose of permitting testimony with regard to its valuation and value.

The next issue concerns the inclusion for estate tax purposes in the decedent's gross estate of United States Treasury bonds of a value of $25,000 which the decedent handed over to Samuel early in 1946. Petitioners contend that prior to the death of the decedent and after numerous discussions the decedent agreed to transfer to Samuel bonds having a face value of $25,000, and that Samuel and Estelle were to receive $10,000 apiece for what each of them was doing and agreed to do in taking care of Jacqueline Want. The remaining $5,000 was to pay the income taxes on the payments in order that each would have $10,000 net amount. The respondent's position is that these sums were not transferred for an adequate and full consideration in money's worth and, therefore, were includible in the gross estate under either section 811 (c) or (d) as of the date of his death and are subject to Federal estate tax. In his opening statement the respondent restricts his argument to 811 (c), but on brief he apparently continues to rely on 811 (d) also, although he gives no reason for such reliance.

Upon the record before us, we have concluded that the transfer of the $25,000 worth of Treasury bonds was made for full and adequate

consideration consisting of the promised services on behalf of Samuel and Estelle toward the care and welfare of Jacqueline. The transfer constituted a payment for services rendered or to be rendered rather than a gift. As to the application of section 811 (d), we can see no relevancy of that section to the situation herein. We have found that there was adequate consideration for the transfer. Obviously there were no retained powers of revocation or alteration attached thereto.

The next issue is whether the decedent's gift in 1946 of 397 shares of common stock of the corporation to Samuel and Estelle, trustees for the benefit of Jacqueline, had any fair market value as of the date of gift and, if so, what that value was. The respondent's determination of the fair market value of the stock of the corporation was based solely on the book value of the shares of stock, as shown on the balance sheet of the corporation that was included in its Federal income tax return for the calendar year 1946, which balance sheet showed a net worth of $79,973.60 or a book value of approximately $200 a share for the entire 400 shares of common stock after allowance of $14,500 for the preferred stock as of January 1, 1946. Petitioners contend that the stock had no fair market value at the date of its transfer on January 9, 1946, to the Jacqueline Want trust, first, because the book value of the stock should have been adjusted to reflect the additional Federal income tax liabilities determined against the corporation for the 3 preceding years and, second, because other evidence indicates the worthlessness of the stock on the valuation date.

The determinations of deficiences involved in these proceedings were made in 1951 and 1952. In 1949 the respondent determined deficiencies in the corporation's liability for Federal income, declared value excess-profits, and excess profits taxes for the years 1943, 1944, and 1945 in the total amount of $261,620.28, together with additions of $130,810.16. These deficiencies were determined pursuant to adjustments made by respondent in 1948. There is nothing in the record to suggest that the corporation was not liable for the taxes and additions so determined. The corporation being on an accrual basis of accounting, the liability for additional Federal taxes should have been reflected on its books as of the year or years for which they were payable and the additions as of the year or years in which returns were filed. *Estate of Esther M. Stein*, 25 T. C. 940, 965, 967. Therefore, the balance sheet of the corporation as of January 1946 understated its Federal tax liability by the sum of $337,362.36 (the total amount of deficiencies and additions determined for 1943, 1944, and 1945 less the addition determined for 1945 in the amount of $55,068.08). It follows that a correct balance sheet of the corporation as of January 1946 would not have shown a net worth of

$79,973.60 but, to the contrary, would have shown a considerable deficit. When the respondent made the determinations of deficiencies here involved in 1951 and 1952, not only was the figure of $79,973.60 (representing net worth) wrong but it was known to be wrong by respondent in view of his adjustment and determination made, respectively, in 1948 and 1949. Accordingly, we conclude that respondent's determination with regard to the value of the corporation's stock as of January 1946 was erroneous since it was concededly predicated on a net worth figure appearing on the corporation's balance sheet, which the record shows to be erroneous and in reality nonexistent. If we were to take the balance sheet of the corporation as the sole criterion of the value of the corporation's stock as of January 1946, as respondent evidently did, we would be forced to the conclusion that the stock was worthless.

No expert testimony was adduced as to the value of this stock. However, from Estelle's testimony and from other parts of the record, the following facts appear: The corporation was primarily a one-man organization, namely, the decedent who had organized it and was its guiding force; its success depended on his continued personal efforts; its machinery was, for the most part, secondhand and in poor condition; its plant was rundown and unsuited to the type of work in which the corporation was engaged; it had a large number of small accounts and only a few large ones; after the decedent's death it was impossible to operate the business successfully, and although attempts were made to sell it, no one was interested in purchasing it in view of its condition. Eventually the stock was sold for a nominal consideration. Of the stock sold, decedent had purchased 150 shares in 1942. This stock and 90 shares of preferred stock were purchased for a total consideration of $4,000. We are informed in petitioners' brief that the preferred stock had a par value of $50. If this is correct, decedent purchased preferred stock having a par value of $4,500 plus the common stock for $4,000. Aside from this sale and the one consummated in 1952, the record discloses no sales of the corporation's common stock. There was no public market for it.

In arguing that this stock had a fair market value in January 1946 of at least $200 a share, the respondent can properly stress the fact (which seems to us to be the only fact shown by the record which tends to establish a value for the stock) that the net income reported by the corporation for 1946 was $160,302.50.

With regard to petitioners' contention that if the properly accruable Federal tax liabilities of the corporation were reflected on its books as they should have been, the liabilities of the corporation would have exceeded its assets by approximately $200,000, respondent contends that since these additional tax liabilities were not formally determined until September 1949 and were thus not publicly known

as of January 1946, they should not be considered in an evaluation of the stock of the corporation as of that date.

We disagree with this argument for two reasons. In the instant proceedings we are considering the evaluation of securities which were not "actually bought and sold during the critical period" "on an open and public market at a price reasonably constant for a long period of time" and for which there was not "a universally accepted market price, the result of numerous transactions in which the general public freely participated." Cf. *Estate of Millie Langley Wright*, 43 B. T. A. 551, 555, 557, 556. Here the stock was closely held, was not listed nor dealt in on any exchange, and the only two sales shown by the record (which tend to show little, if any, fair market value for the stock) took place several years before and after the critical date. Therefore, we must consider the fair market value of the stock to be the price which it would obtain in a hypothetical transaction between a hypothetical buyer and a hypothetical seller. As a part of the hypothesis we suppose that the buyer and the seller were each willing, under no compulsion to buy or sell, and both "were aware of the facts" (*James Couzens*, 11 B. T. A. 1040, 1162) or were "familiar with the situation" (*George D. Harter Bank, Executor*, 38 B. T. A. 387, 396). Therefore, under the facts present in the instant proceedings, we must consider the question of what was the fair market value of the stock as of the critical date upon the assumption that the pertinent facts as to value were known. Certainly a most pertinent fact would be that the liabilities of the corporation exceeded its assets by approximately $200,000. In the second place, aside from the assumption or hypothesis of a knowledge of these additional tax liabilities as an incident to the legal concept of fair market value, there is uncontradicted testimony in the record that there were such prevalent rumors with regard to the additional tax liabilities of the corporation that we must make the factual inference (as distinguished from a legal hypothesis) that any prospective buyers of the corporation would inquire and ascertain the facts concerning them. Estelle testified that "[t]he minute I got up there [to New York] I heard there were taxes due. In fact, everybody in the business knew it"; and, further, that "the rumor was all over the city about this tax case, everybody in the business knew about it, they all backed away and it cost us a lot of money."

We conclude that under all of the facts shown by the record herein the petitioners have demonstrated that respondent's determination as to the fair market value of the stock here in question was erroneous, and that they have established by a preponderance of the evidence that the stock had no fair market value as of the critical date.

Another issue concerns the liability of petitioners for the gift tax and additions involved for the failure to report certain gifts made by

the decedent to Blossom S. Ost of $15,637.38 in 1945 and $34,186.71 in 1946. Petitioners concede that these gifts must be taken into account in determining the decedent's gift tax liability. Blossom Ost has stipulated in this Court her transferee liability in the amount determined by the respondent. She has proffered the payment to the respondent of $2,500 and has deposited this amount with him in connection with an offer in compromise of her gift tax liability, but that offer has not been accepted by the respondent. Petitioners now seek to have us take the $2,500 deposited by Blossom Ost with the respondent in connection with this offer into account as an offset against any gift tax liability that might be determined against them. As Blossom Ost's offer of compromise was neither accepted nor rejected by the respondent, we do not believe that the facts involved herein impose the duty on the respondent to offset petitioners' liability by the amount offered in the compromise. See *Isaac Michael Green*, 26 B. T. A. 719. We reject petitioners' argument as to an offset of the $2,500 proffered to the Commissioner by Blossom Ost in connection with an offer of compromise of her tax liability.

The last question has to do with Estelle's liability for any of the deficiencies here involved. She argues that she was a fiduciary in name only, that she did not actually and personally receive any funds of the decedent as transferee or trustee, that she did not know of the existence of the tax liabilities of decedent here involved until 1954, and that she consequently has no liability as transferee or trustee. After a careful consideration of the entire record we are convinced that the facts and the inferences to be fairly made from the facts support respondent's determinations that she is so liable. She was aware of all the facts having to do with the extent of decedent's estate, and cooperated materially in steps necessary to its preservation. She was aware from a date considerably before decedent's death that he had made gifts described by her as "huge" to Blossom Ost. She was an adult woman trained in business, and performed important services in the operation of the corporation's business. She must be assumed to know that under the law gift taxes and estate taxes were payable. Through her and by her cooperation large sums from the assets of decedent were put into the custody of Samuel, and were then received by her from the account of the estate maintained by him and disbursed by her and under her direction. From her testimony in these proceedings we formed the opinion that she was a woman of strong personality, high intelligence, and considerable ability. We are unable to believe that in all matters connected with the trust and the estate and in the transactions connected therewith in which she participated she was a mere automaton directed by Samuel.

*Decisions will be entered under Rule 50.*