ESTATE OF DONALD M. NELSON, DECEASED, LENA M. NELSON, EXECUTRIX, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 978–64. Filed December 9, 1966.

*William E. Murray, Kent M. Klineman,* and *Thomas Mason Clyde,* for the petitioner.

*Rudolph J. Korbel* and *Stanley J. Goldberg,* for the respondent.

TANNENWALD, *Judge:* Respondent determined a deficiency in the estate tax of petitioner in the amount of $354,911.22.

The sole issue for our determination is what portion, if any, of an inter vivos trust set up for the benefit of the former wife of petitioner's decedent is includable in his estate.[1]

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Petitioner is the Estate of Donald M. Nelson, deceased. The decedent died on September 29, 1959, in Los Angeles, Calif., and his widow, Lena M. Nelson, is the duly appointed executrix of the estate. Petitioner's estate tax return was filed with the district director of internal revenue, Los Angeles, Calif.

Decedent was continuously employed by Sears Roebuck & Co. from 1912 until 1942. In 1939 he became executive vice president and chairman of the executive committee. He held these positions until 1942 when he resigned to become Chairman of the War Production Board, a wartime agency of the United States in Washington, D.C., where he remained until 1944. On occasion during the years 1943 and 1944, decedent acted as personal representative of the President of the United States to the Republic of China and the Soviet Union.

During the period 1939–42, decedent's salary from Sears Roebuck was $75,000 per year and he received an additional $25,000 to $30,000 annually from dividends on his holdings of Sears Roebuck stock. His total income for that period was in excess of $100,000 per year. In 1944, decedent earned approximately $15,000 in salary from the Government and approximately $42,500 of dividends on his Sears Roebuck stock.

---

[1] The parties recognize that a redetermination of the marital deduction under sec. 2056 of the *Internal Revenue Code of 1954* is necessary if we find that *any amount of the trust* should have been included in the gross estate. Such redetermination shall take place under the Rule 50 computation.

Prior to his marriage to Lena, the decedent had been married to Helen W. Nelson from December 18, 1926, until January 19, 1945. Decedent and Helen had no issue.

In 1931, after decedent became vice president in charge of merchandising of Sears Roebuck, he and Helen purchased a home at 595 Longwood Drive, Glencoe, Ill., for $75,000. They lived there together until decedent went to Washington, D.C., in 1942, and Helen continued to live there until their divorce in 1945. The house was a 14-room mansion with 3 acres of land and a private beach. It required a large domestic staff including a "live-in" couple, a laundress, and a gardener, as well as extra help for large parties. During their years together in Illinois, the Nelsons maintained four automobiles, entertained lavishly, and led an active social life which involved a circle of wealthy and successful friends and acquaintances.

During their marriage, the Nelsons traveled to Europe, South America, and the West Indies, as well as extensively within the United States. Decedent was a director of the Union Pacific Railroad and was provided with a private railroad car for trips within the United States. The Nelsons also owned a 65-foot yacht requiring a crew of 5 and having sleeping quarters for 14 passengers.

In early 1944 decedent informed Helen that he wanted a divorce. Helen informed decedent that she would agree to a divorce only if a property settlement could be worked out between them. Negotiations between the Nelsons' attorneys about the terms of the settlement agreement continued for almost a year.

At the time of the divorce negotiations, Helen's attorneys advised her that in a contested Illinois divorce proceeding she could expect to be awarded approximately one-third of her husband's income as alimony. Decedent refused to enter into a settlement on that basis. At the time of the negotiations, Helen was seriously ill. She suffered from chronic emphysema, a serious lung condition, which, in addition to the physical discomfort it caused, burdened her with medical bills of about $5,000 annually. During the negotiations, Helen's physician informed her that she should permanently move to Arizona because of her continuing lung condition. For this reason and because she was reluctant to undertake lengthy, expensive, and publicly embarrassing litigation, she agreed, shortly before January 17, 1945, to a settlement on decedent's terms, despite the advice of her attorneys to hold out for a more satisfactory alimony award through the courts.

On January 17, 1945, Helen filed an action for divorce against decedent in the Superior Court of Cook County, Ill. Decedent immediately filed a formal answer and the attorneys for both parties filed a stipulation permitting the court to grant an immediate hearing.

On January 18, 1945, decedent and Helen entered into an agreement in order to settle their respective property rights, dower rights, and the rights of Helen for alimony and attorneys' fees in the event the court entered a decree of divorce in the pending action. The settlement agreement provided in pertinent part:

1. That upon the hearing of said divorce proceedings the wife will, in her testimony and by approval of the decree, waive any and all claims for alimony or attorneys' fees in the event that the court shall indicate that a decree of divorce will be granted, and that such decree shall contain no reservation of jurisdiction by the court in connection with the payment of any alimony or attorneys' fees, but shall recite that a complete and satisfactory property settlement has been agreed upon between the husband and wife.

2. That if and when a decree shall have been entered as aforesaid, immediately thereafter the husband agrees to pay, transfer and deliver to the wife, in full satisfaction and discharge of all claims for alimony and all other claims arising out of the marital status of said husband and wife, and the wife agrees to accept as and for and in full satisfaction and discharge of all such claims for alimony, dower and all other claims arising out of the marital status of said husband and wife, the following:

(a) A bill of sale to all and singular the furniture and furnishings contained in the building known as 595 Longwood Drive, Glencoe, Illinois, other than the personal property, furniture and furnishings contained in the room heretofore occupied by the husband and heretofore removed by him therefrom.

(b) The sum of seventy-five hundred dollars ($7500) in full payment for attorneys' fees incurred by the wife.

(c) The husband agrees to execute and deliver upon the entry of the decree of divorce aforesaid a trust agreement, a copy of which is hereto attached, marked "Exhibit A", identified by the signatures of the parties hereto, and incorporated herein as though fully set forth in the body of this agreement, and to deliver simultaneously with the execution thereof the certificates of stock, properly endorsed for transfer, specifically recited therein as constituting the corpus of the trust.

*     *     *     *     *     *     *

3. It is understood and agreed that the title to the property known as 595 Longwood Drive, Glencoe, Illinois, is owned by the parties hereto in joint tenancy. It is understood that the title to said property shall so remain in joint tenancy until the sale or other disposition of the same shall be made by a joint agreement, and in the event of a sale thereof the net proceeds, except as hereinafter specifically provided, shall be divided equally between the parties and each of the parties hereto agree that if and when a sale shall have been approved by both of them, they and each of them will execute the necessary deeds of conveyance and other documents required for a sale and conveyance thereof.

*     *     *     *     *     *     *

4. The husband agrees to deliver or have delivered forthwith to the wife, 460 shares of the common stock of Sears Roebuck & Co. now issued in the name of the wife or properly endorsed for transfer to her.

*     *     *     *     *     *     *

7. If, for any reason whatsoever, the court refuses or fails to enter a decree of divorce within thirty days from this date in favor of the wife in the above-mentioned proceedings, this agreement shall thereupon become null and void and of no further force or effect.

On January 19, 1945, the Superior Court entered a decree of divorce, which provided the following:

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the parties hereto have settled all property and alimony rights of each against the other; that each of the parties hereto shall be forever barred and foreclosed from any and all claims that either may have or claim to have against the other as and for alimony, past, present and future, attorneys' fees, Court costs, dower, homestead, and any and all other claims that either may have or claim against the other, whether accruing out of the marital relations heretofore existing or otherwise.

At the time of the divorce, decedent was 56 years old and Helen was 53 years old.

Decedent's personal net worth (assets less liabilities) in January 1945 was in excess of $900,000.

On January 19, 1945, pursuant to the agreement between decedent and Helen, decedent as grantor entered into a trust agreement with the Chicago Title & Trust Co. as trustee which provided the following:

(a) During decedent's lifetime and until Helen's remarriage, Helen would receive the entire net income of the trust. In any year in which the income paid Helen from the trust plus the dividends paid on the 460 shares of Sears Roebuck common stock amounted to less than $9,000 after income taxes, she would receive payments of principal sufficient to make up the difference.[2]

(b) Upon Helen's remarriage, while decedent was living, the trustee was to pay over two-thirds ($\frac{2}{3}$) of the then-principal of the trust to decedent. The trustee was to continue to hold the remaining one-third ($\frac{1}{3}$) and to pay the net income to Helen. Upon Helen's death, the then-principal of the remaining one-third ($\frac{1}{3}$) was to be paid to the appointees specified in Helen's will, otherwise to her distributees.

(c) In the event of Helen's death before remarrying and prior to decedent's death, the trustee was to pay seven-twelfths ($\frac{7}{12}$) of the then-principal of the trust to decedent. The remaining five-twelfths ($\frac{5}{12}$) was to be distributed to the appointees specified in Helen's will, otherwise to her distributees.

(d) In the event of decedent's death prior to Helen's remarriage or death, three-fourths ($\frac{3}{4}$) of the then-principal was to be paid over to Helen. The trustee was to continue to hold the remaining one-fourth ($\frac{1}{4}$) and was to pay the net income therefrom to Helen during her lifetime. Upon her death, the then-principal of the remaining trust was to be distributed to decedent's surviving issue, or, absent such issue, to Helen's appointees, and, in default of such appointment, to Helen's distributees.

---

[2] The dividends paid on 460 shares of the common stock of Sears Roebuck & Co. during the calendar year 1944 were $1,955 ($4.25 per share).

(e) The trustee was given discretionary authority to invade Helen's share of the principal of the trust upon her written application alleging need. In the event of decedent predeceasing Helen, she was to have the right thereafter to demand up to $5,000 of principal each year.

The agreement further provided:

ARTICLE FIFTH: This agreement is hereby declared to be irrevocable. Nevertheless, it may be altered or amended from time to time by a memorandum in writing, executed by both Donald M. Nelson and Helen W. Nelson and delivered to the Trustee, * * *.

On the same day, January 19, 1945, decedent transferred to the trustee 2,500 shares of common stock of Sears Roebuck & Co. having an aggregate value on that date of $261,250.

On January 27, 1959, decedent and Helen executed and delivered a memorandum to the trustee altering and amending the trust agreement and, among other things, giving Helen the right to withdraw absolutely, no later than December 31, 1960, three-twentieths ($3/20$) of the shares of the common stock of Sears Roebuck held by the trustee and providing that, if this were done, appropriate adjustments in the percentages relating to the remaining portion of the trust would be made so that any such withdrawal would be charged against the share to which Helen or her appointees or distributees would be entitled and not to the share to which decedent or his issue would be entitled.

At the date of decedent's death the value of the assets of the trust was $1,267,797.81.

Petitioner excluded the entire value of the trust from the gross estate. Respondent determined in his notice of deficiency that the value of the trust at the date of death ($1,267,797.81) was includable under section 2038(a)[3] less $216,571.38 under section 2043, which latter amount respondent concedes was "consideration in money or money's worth received by decedent."[4]

### OPINION

This case involves two basic issues: (1) Whether an inter vivos trust, with respect to which the decedent retained a power to alter or amend in conjunction with his former wife, is nevertheless excludable in its entirety from his gross estate under the doctrine of *Harris* v. *Commissioner*, 340 U.S. 106 (1950), and (2) whether, even if *Harris* does not apply, the trust is nevertheless excludable in whole or in part because the decedent received consideration. The pertinent sections of the

---

[3] All references are to the Internal Revenue Code of 1954 unless otherwise indicated.

[4] The respondent determined the annual value of Helen's support rights at the time of her divorce from decedent to have been $20,000. This annual support right amount was multiplied by the actuarial factor representing Helen's life expectancy in 1945 as modified by the possibility of her remarriage (10.66982) and by the quarterly payment factor (1.01488). This computation resulted in a figure of $216,571.38.

Code are set forth in the margin.[5] Both parties approach these issues on the premise that the trust assets should be viewed as a unified package. Neither discusses the possibility of a starting point which fragments the trust into the various interests created.

We think the various interests in the property transferred should first be analyzed. When there is less than a full, unrestricted transfer of ownership of property, such as occurs in a transfer in trust, various interests in the property come into existence. A life interest in a trust is really a right in the income from the property; a remainder, even though it may be vested, actually represents no more than a right to obtain the property at a future date. In short, we employ a fragmented as distinct from a unified approach to the trust involved herein. Cf. *Estate of Robert Rodger Glen*, 45 T.C. 323 (1966), on appeal (C.A. 9, Aug. 29, 1966); *Estate of Hubert Keller*, 44 T.C. 851 (1965); *Estate of John M. Goetchius*, 17 T.C. 495 (1951).

What interests were created?

(a) Helen was given the right to the income from the trust in varying amounts ranging from one-fourth to all of the income, depending upon events occurring which would cause a portion of the corpus to be distributed to her.[6]

(b) Helen was given the right to receive or make a testamentary disposition of certain portions of the corpus, ranging from one-third to three-quarters. Those portions over which she was given a testamentary power of disposition were to go to her intestate distributees in the event that the power was not exercised.

(c) The decedent retained a contingent interest in seven-twelfths of the corpus, if he survived Helen and if she had not remarried, and in two-thirds of the corpus, if he survived the time of Helen's remarriage.

---

[5] SEC. 2038. REVOCABLE TRANSFERS.

(a) IN GENERAL.—The value of the gross estate shall include the value of all property (except real property situated outside of the United States)—

(1) TRANSFERS AFTER JUNE 22, 1936.—To the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, where the enjoyment thereof was subject at the date of his death to any change through the exercise of a power (in whatever capacity exercisable) by the decedent alone or by the decedent in conjunction with any other person (without regard to when or from what source the decedent acquired such power), to alter, amend, revoke, or terminate, or where any such power is relinquished in contemplation of decedent's death.

SEC. 2043. TRANSFERS FOR INSUFFICIENT CONSIDERATION.

(a) IN GENERAL.—If any one of the transfers, trusts, interests, rights, or powers enumerated and described in sections 2035 to 2038, inclusive, and section 2041 is made, created, exercised, or relinquished for a consideration in money or money's worth, but is not a bona fide sale for an adequate and full consideration in money or money's worth, there shall be included in the gross estate only the excess of the fair market value at the time of death of the property otherwise to be included on account of such transaction, over the value of the consideration received therefor by the decedent.

[6] Obviously, if Helen received an outright distribution of principal, she would continue to be entitled to all of the income therefrom.

(d) Decedent's issue were given a contingent remainder in one-quarter of the corpus, in the event of decedent's death prior to Helen's death or remarriage.[7]

All of these interests were subject to the right of decedent to alter or amend in conjunction with Helen. To the extent that these interests existed at the time of decedent's death and absent a finding of "adequate and full consideration," they fall within the explicit provisions of section 2038(a).

We can readily dispose of the interests represented by (c) and (d). With respect to (c), decedent's interest in seven-twelfths or two-thirds of the corpus depended upon his surviving Helen's death or re-marriage as the case might be. If he was not living, at the time of occurrence of either of these two conditions, his interest lapsed; it did not pass to his heirs, distributees, or legal representatives. Thus, it did not constitute a reversion in the full sense of that term. Under these circumstances, the decedent's death prevented the interest from ever taking effect and it is therefore not a proper subject of tax. See *Goodman v. Granger*, 243 F. 2d 264, 268 (C.A. 3, 1957) ; cf. *Maryland National Bank v. United States*, 236 F. Supp. 532 (D. Md. 1964) ; Rev. Rul. 55–438, 1955–2 C.B. 601. The instant situation is to be distinguished from those involving a full reversion in decedent where includability under section 2033 obtains. E.g., *Adriance v. Higgins*, 113 F. 2d 1013 (C.A. 2, 1940) ; *Estate of Sallie Houston Henry*, 4 T.C. 423, 445–446 (1944), affd. 161 F. 2d 574 (C.A. 3, 1947). Likewise, since we dispose of the problems presented by the alternative dispositions in the event of decedent's prior death elsewhere in this opinion (see pp. 287–289, *infra*), there is no need to consider the applicability of section 2037. Decedent's interest as represented by (c) is therefore not includable in his gross estate.[8]

With respect to (d), we do not agree with petitioner that *Harris v. Commissioner, supra*, applies. We have only recently directed our attention to the convolutions of *Harris*. *Estate of Robert Rodger Glen, supra; Estate of Hubert Keller, supra*. However large the haven of the Supreme Court's decision in *Harris* may ultimately prove

---

[7] The 1959 amendment to the trust gave Helen the absolute right to draw down 3/20 of the corpus at any time prior to Dec. 31, 1960. Such withdrawal was to be charged to Helen's contingent rights to receive, or make a testamentary disposition of, corpus. In other words, the fractional shares of corpus to be distributed in various contingencies were adjusted accordingly, so that the economic effect remained the same. Thus, decedent's contingent interest was changed to 35/51 or 40/51. These fractions of the corpus after taking into account the withdrawal of 3/20 by Helen are the same as 7/12 or 2/3ds of the corpus without such withdrawal. Since there is no evidence that Helen exercised her right of withdrawal, the fractions as set forth in the original trust instrument will be applicable in determining the portions of the trust, as of the date of death, which are properly includable in decedent's gross estate.

[8] In view of our holding, we do not reach the question of the applicability of *Harris* or sec. 2516 to decedent's contingent interest. Cf. our discussion of the includability of the contingent remainder in favor of decedent's issue.

to be, we do not think that the protective shadows of that case should cover an interest existing at death which is subject to a proscribed reserved power such as decedent retained. There were no minor issue of the marriage and Helen had only a contingent right of disposition in the event that decedent had no issue. There is no basis for finding that any consideration was actually paid for such interest. And we have previously held that, under such circumstances, the interest cannot be held to have been "founded" upon the divorce decree so as to provide a substitute for actual consideration under the *Harris* doctrine. Cf. *Estate of Hubert Keller, supra; Karl T. Wiedemann*, 26 T.C. 565 (1956).

We are equally unconvinced that section 2516 [9] has any bearing on the includability of the contingent remainder, represented by (d), assuming we were willing to import that section into the estate tax— a course we have thus far studiously avoided. See *Estate of Robert Rodger Glen, supra* at 337; *Estate of Hubert Keller, supra* at 861. Here again this remainder cannot be said to have been transferred in settlement of the support rights of Helen or of minor issue. Cf. *Estate of Hubert Keller, supra; Karl T. Wiedemann, supra.*

We hold that *Harris* and section 2516 are inapposite. The contingent remainder represented a right to one-fourth of the trust. The value of this portion of the trust at the time of decedent's death is includable in decedent's gross estate.[10]

With respect to the interests created for the benefit of Helen (items (a) and (b), *supra*), section 2038(a) excepts transfers for which the decedent has received "adequate and full consideration." [11] Respondent concedes that Helen furnished consideration at the time of the creation of the trust in the amount of $216,571.38 based upon his calculation that she was entitled to support to the extent of $20,000 per annum. The principal of the trust at that time was $261,250.

While the determination of includability of the various interests is made as of the time of decedent's death, the analysis of whether de-

---

[9] SEC. 2516. CERTAIN PROPERTY SETTLEMENTS.

Where husband and wife enter into a written agreement relative to their marital and property rights and divorce occurs within 2 years thereafter (whether or not such agreement is approved by the divorce decree), any transfers of property or interests in property made pursuant to such agreement—

    (1) to either spouse in settlement of his or her marital or property rights, or

    (2) to provide a reasonable allowance for the support of issue of the marriage during minority,

shall be deemed to be transfers made for a full and adequate consideration in money or money's worth.

[10] The existence of issue of the decedent at the time of his death (as to which the record is silent) is not a factor since decedent, in conjunction with Helen, could have at any time substituted another person, including decedent himself or his estate to receive that interest. See also fn. 12, par. (e), *infra.*

[11] Although the excepting clause refers to "a bona fide sale," the decided cases have not drawn any distinction based upon that phrase. See 1 Mertens, Law of Federal Estate & Gift Taxation, sec. 5.03, and particularly fn. 34 thereto.

cedent received "adequate and full consideration" for any of such interests is made as of the time of initial transfer. We embark upon such analysis by examining, as of the time of the establishment of the trust in 1945, the *maximum* which Helen might possibly have received and valuing that maximum and comparing it with the consideration paid as of that time. Under the terms of the trust instrument, if she did not remarry and if she survived the decedent, she was entitled to the entire income for her life. Helen was 53 years old at the time of the creation of the trust. The value of her life interest, undiluted by the contingencies noted and based upon respondent's tables, was $126,384.91 (.48377×$261,250).

The values of Helen's interest in the corpus, depending upon the probabilities of the contingencies involved, are as follows:

(a) If she remarried, which it was in her power to do immediately, she would nevertheless continue to receive the income from one-third of the corpus and retain the right to dispose of that amount upon her death. We have already included the value of her income interest in our calculation of the value of her life interest in the entire corpus. We equate her right to dispose of one-third of the corpus at her death with the present value of an equivalent remainder interest at the death of a person aged 53. That value is $44,955.03 (⅓×$261,250×.51623).

(b) If she survived decedent without remarrying, she would be entitled to receive three-fourths of the corpus. Without discounting for the possibility of her remarriage, but taking into account the probability of her surviving the decedent, the value of this right was $70,333.73 (¾×$261,250×.35896). See Actuarial Values for Estate and Gift Tax (U.S. Treas. Dept., 1959), Part I, ex. 7.

(c) If she predeceased decedent, she would have the right to make a testamentary disposition of five-twelfths of the corpus. We equate the value of this right with the present value of a remainder interest due at the death of the younger of two persons aged 53 and 56, provided the older survives. Without discounting for the possibility of her remarriage, the value of this right was $30,250.57 (5⁄12×$261,250×.27791). See Actuarial Values for Estate and Gift Tax, *supra*, ex. 6.

Taking the highest of these various values, i.e., the point of view most favorable to respondent, we find that as of the date of transfer ,Helen received from the decedent interests worth no more than $196,718.64 ($126,384.91 plus $70,333.73) or less than the amount of the consideration she furnished. As a consequence and without necessarily implying that "full and adequate consideration" demands a precise dollar-for-dollar matching of consideration paid with the value of the transferred interests received, we hold that the exclu-

sionary condition of section 2038(a) has been met with respect to the interests of Helen (items (a) and (b), *supra*).[12]

Our holding makes it unnecessary for us to consider petitioner's arguments as to whether decedent's power to alter or amend these interests with Helen's consent conferred upon decedent any greater right than he would have had in any event under Illinois law (cf. *Helvering* v. *Helmholz*, 296 U.S. 93 (1935); sec. 2038–1(a), Estate Tax Regs.); whether *Harris* v. *Commissioner*, *supra*, operates undiluted by the existence of decedent's power to alter and amend the provisions of the settlement for the benefit of Helen; whether Helen in fact furnished consideration in an amount greater than that conceded by respondent, or whether such interests represented a claim of Helen against decedent's estate deductible under section 2053.

Since we have found that consideration paid was not involved with respect to the interests of decedent which we have held to be includable and that "adequate and full consideration" was received for Helen's interests, there is no occasion for section 2043(a), dealing with transfers for partial consideration, to come into play. We note, however, that, in the few decided cases, the applicability of that section has been overshadowed by other issues of seemingly greater import, with

---

[12] Our rationale would apply equally to any consideration of sec. 2037 where the language "adequate and full consideration" also appears.

Some curlicues need to be disposed of:

(a) There is a seeming overlap between Helen's interests as stated and the interests of decedent previously outlined due to the fact that for the purpose of determining whether decedent received full and adequate consideration for Helen's interests, we have assumed the maximum benefits to Helen—an assumption most favorable to respondent and unfavorable to petitioner.

(b) Helen was guaranteed $9,000 per annum from the trust. Based upon her age (53), the commuted value of a life annuity in this amount, based on respondent's tables, would be only $124,398.90 (factor of 13.8221), or less than the value of her life interest in the income of the trust. The guaranty of income element can therefore be ignored.

(c) If Helen survived decedent, she was also entitled to demand $5,000 per annum from the principal of the trust. "ARTICLE THIRD" of the trust instrument is not clear as to whether any amounts so withdrawn would be charged against the share to which she was ultimately entitled. If they were so to be charged, the right of invasion can be disregarded, since we have already assumed, for the purposes of our calculations, the maximum amount to which she was entitled. If they were not so to be charged, the difference in the life expectancies of decedent and Helen was sufficiently small that the added value of her right of invasion after decedent's death would not affect our decision. The right to invade is the equivalent of an annuity of $5,000 payable to Helen for such time as she survived decedent. We calculate this amount to be $17,230 (see U.S. Treas. Dept., Actuarial Values for Estate and Gift Tax, ex. 17). We note, however, that if this amount is counted in full, the value of Helen's income interests and other rights to corpus would have to be correspondingly adjusted downward.

(d) Respondent has not suggested that the value of 460 shares of Sears Roebuck, the outright ownership of which was vested in Helen under par. 4 of the settlement agreement, should be taken into account in determining whether decedent received "adequate and full consideration." Indeed, neither of the parties at any time referred to these shares in any context. We have accordingly not taken the shares into account.

(e) Since we have already held the right to one-fourth of the trust, representing the contingent remainder to decedent's issue, to be includable, we do not have to take into account, in calculating what Helen received, the possibility that this interest might pass to Helen's appointees or distributees in default of such issue. See pp. 286–287, *supra*.

the result that its ramifications are not clear in respect of:[13] (1) Whether the underpinning of the section should be a fragmented or unified view as to the interests involved, cf. *Estate of Robert Rodger Glen, supra; Estate of Hubert Keller, supra;* (2) whether the section permits the reduction of the amount otherwise includable by only the value of the consideration received at the time the transfer was made, cf. *United States* v. *Past,* 347 F. 2d 7 (C.A. 9, 1965) ; *Vardell's Estate* v. *Commissioner,* 307 F. 2d 688 (C.A. 5, 1962) ; *Estate of Lillian B. Gregory,* 39 T.C. 1012 (1963) ; *D. G. McDonald Trust,* 19 T.C. 672 (1953) ;[14] (3) whether the section permits a proportion, based upon the ratio of the amount of the consideration paid to the total assets transferred, both valued at the time of transfer, to be applied to the aggregate value of the includable interests as of the date of death, cf. *Helvering* v. *United States Trust Co.,* 111 F. 2d 576 (C.A. 2, 1940) ; *United States* v. *Past, supra* (dissenting opinion) ; or (4) whether the use of such ratio determined under a fragmented approach as of the time of initial transfer and applied separately to the value of each includable interest as of the date of death would be more appropriate.

Our rationale also makes it unnecessary to explore the highways and byways of Illinois law as to whether the settlement agreement was in fact submitted to the divorce court, and the nature of that court's initial and continuing jurisdiction over the settlement. Neither need we enter the briarpatch populated by questions of the parol evidence rule nor dispose of objections of the parties to various portions of the testimony under that rule and otherwise.

*Decision will be entered under Rule 50.*

---

[13] For a recent discussion of the allocation problem under sec. 2043 (a), see Lowndes, "Consideration and the Federal Estate and Gift Taxes," 35 Geo. Wash. L. Rev. 50 (1966).

[14] A recent District Court decision applies a variation of this approach by measuring the consideration by the amount actually received by the decedent from the date of the transfer to the date of death. *Righter* v. *United States,* 258 F. Supp. 763 (W.D. Mo. 1966).