Anne T. SMITH and Laura G. T. Robinson, Co-Executrices of the Estate of Peter G. Thomson, Jr., Deceased, Plaintiffs,

v.

UNITED STATES of America, Defendant.

No. 65–183–Civ–Orl.

United States District Court
M. D. Florida,
Orlando Division.

Oct. 30, 1967.

Philip Schneider, of Waite, Schindel, Bayless & Schneider, Cincinnati, Ohio, and Stephen T. Dean, of Anderson, Rush, Dean & Lowndes, Orlando, Fla., for plaintiffs.

Mitchell Rogovin, Asst. Atty. Gen., Stanley F. Krysa and Eugene P. Kopp, Dept. of Justice, Washington, D. C., and Edward F. Boardman, U. S. Atty., Tampa, Fla., for defendant.

## MEMORANDUM OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW.

DUNCAN, Senior District Judge.

Plaintiffs, who were daughters of Peter G. Thomson, Jr., deceased, and co-executrices of his estate, instituted this suit to recover the sum of $192,550.40 Federal Estate Tax and $24,933.32 interest thereon, which was alleged to have been improperly included in the gross estate of said Peter G. Thomson, Jr., by the Commissioner of Internal Revenue pursuant to § 2038(a) (2) Internal Revenue Code of 1954.[1]

In 1929 Peter G. Thomson, Jr., created a trust in the agreed sum of $188,-000.00 in favor of his wife, Laura S. Thomson, now Laura S. Lawmill. At the time of his death in 1960 the trust had an agreed value of $561,304.16. Following his death the executrices of his estate filed a Federal Estate Tax Return, which reflected a total gross estate of $1,032,533.48 and a taxable estate of $909,945.69.

After audit of the return by the Commissioner, he determined that the value of the trust at the time of Peter G. Thomson's death, $561,304.16, was includible in the gross estate of the deceased under § 2038(a) (2) because the trust was revocable (the trust provided that it could be revoked or altered only by the consent of both parties). A deficiency was assessed, paid, and a claim for refund filed. Following disallowance of the claim by the Commissioner, this action was timely filed.

It is the contention of the plaintiffs that the trust was created in anticipation of a divorce between Peter G. Thomson, Jr., and Laura S. Thomson and that therefore Trust Fund A is the excepted case of a transfer, "for an adequate and full consideration in money or money's worth", said exception being contained within § 2038(a) (2) I.R.C. It is also contended that the following comprise the said consideration:

The discharge of Peter from the duty to provide marital support for his wife, the discharge of the grantor-decedent from his obligation to repay Laura amounts which he had taken from her, and the receipt by the decedent of certain real property from Laura.

[1] "Section 2038—Revocable Transfers

(a) In general.—The value of the gross estate shall include the value of all property—

(2) Transfers on or before June 22, 1936.—To the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, where the enjoyment thereof was subject at the date of his death to any change through the exercise of a power, either by the decedent alone or in conjunction with any person, to alter, amend, or revoke, or where the decedent relinquished any such power in contemplation of his death. Except in the case of transfers made after June 22, 1936, no interest of the decedent of which he has made a transfer shall be included in the gross estate under paragraph (1) unless it is includible under this paragraph."

It is further contended by plaintiffs that § 2516 Title 26 U.S.C.A.,[2] pertaining to the Gift Tax is applicable to the instant case and therefore the decedent is deemed to have received full and adequate consideration for the transfers to the trust because it was created pursuant to a written agreement made within two years of the divorce decree and was created in favor of his spouse in settlement of her marital or property rights. It is finally contended that § 2043(a) Title 26 U.S.C.A.,[3] which seeks to value the trust as of the date of death of the decedent, has no application in the instant case.

In order to fully understand the nature of the contentions of the respective parties it is necessary to review, at some length, not only the family background of Peter and Laura Thomson, but their marital relations as well. They were married April 14, 1914, when Laura was 19 and Peter was 36 years of age. Peter was the scion of a wealthy father, and at the time of his marriage was highly experienced and successful in financial affairs. Laura, daughter of a wealthy father, was, at her age, entirely inexperienced in business affairs and in the affairs of life.

Following their marriage they lived in the palatial residence of Peter G. Thomson, Sr., known in Cincinnati, Ohio, as "The Marble Palace". Two daughters, the plaintiffs, were born in quick succession following the marriage.

Sometime prior to 1920 a disagreement arose between the father and the son concerning control of the Champion Fiber Company, a company which had been organized by the father. This disagreement resulted in Peter G. Thomson, Jr., and his family leaving the parental home, and acquiring another home for his family at 4 and 5 Beach Crest Lane in Cincinnati.

After 1920 Peter and Laura ceased to live together as husband and wife, but continued to reside in the Beach Crest Lane residence. For the next several years, although maintaining outward semblances of marital tranquility, they drifted further and further apart. During this period Peter continued to fully and appropriately provide for his family.

Early in their married life Laura had executed a general power of attorney to Peter at his request so that he could handle her finances. During this period her father gave her various sums of money and transferred substantial amounts of securities to her, specifically, $156,-192.75 of American Rolling Mill Company stock, a company which had been organized by her father, $60,000.00 of Champion Fiber Company stock, and a check in the sum of $100,000.00 making a total of $316,192.75. We believe that the evidence reveals that all of the stocks and the money came into the possession of Peter under the power of attorney. However, exactly what he did with it was not entirely clear from the evidence.

2. "Section 2516. Certain property settlements—
   Where husband and wife enter into a written agreement relative to their marital and property rights and divorce occurs within 2 years thereafter (whether or not such agreement is approved by the divorce decree), any transfers of property or interests in property made pursuant to such agreement—
   (1) to either spouse in settlement of his or her marital or property rights, or
   (2) to provide a reasonable allowance for the support of issue of the marriage during minority, shall be deemed to be transfers made for a full and adequate consideration in money or money's worth."

3. "Section 2043. Transfers for insufficient consideration
   (a) In general.—If any one of the transfers, trusts, interests, rights, or powers enumerated and described in sections 2035 to 2038 inclusive, and section 2041 is made, created, exercised, or relinquished for a consideration in money or money's worth, but is not a bona fide sale for an adequate and full consideration in money or money's worth, there shall be included in the gross estate only the excess of the fair market value at the time of death of the property otherwise to be included on account of such transaction, over the value of the consideration received therefor by the decedent."

Prior to 1927 Peter asked for a divorce, but Laura refused. However, in early 1927, Laura finally consented but Peter then indicated a change of mind, but in the Fall of 1928 he again raised the subject of a divorce and prepared in his own handwriting, a proposed agreement which set forth the details of the divorce that was to be obtained and a suggested property settlement. The agreement stated:

"(1) Proceedings to secure the divorce will be initiated within ninety days and consummated as soon as possible thereafter. The cause for divorce will be 'incompatability', and in case other cause must be given to secure it, such words as 'desertion', or 'cruelty', etc. may be added but nothing will be said to reflect upon the moral conduct or physical fitness of either party. No mention of the divorce will be made to relatives or friends, except parents, until it is secured, and P. G. T. Jr. will find out as quickly as possible which state other than Ohio is best in which to secure it. (2) The children shall be given to the legal custody of Laura S. Thomson, but P. G. T. Jr. shall have the privilege of seeing them at mutually convenient times. (3) The house and grounds and 4 & 5 Beach Crest Lane will be transferred to P. G. T. Jr. (4) P. G. T. Jr. will purchase and place in the name of L. S. T. six hundred shares of American Rolling Mill Common stock. He will also create a trust fund containing sufficient good stock from stock now in name of L. S. T. and P. G. T. Jr. of which the dividends total twelve thousand dollars per year, the proceeds of same to be paid by the Trustee to L. S. T. for balance of her life and at her death to Anne and Laura Gamble Thomson. He will also either purchase a house for Laura S. Thomson when she leaves 4 & 5 Beach Crest Lane or in lieu thereof give her sixty thousand dollars. Peter G. Thomson, Jr. to continue to have the right as heretofore to sell or transfer stocks or property in the name of L. S. T. until this agreement is consummated."

This agreement was signed by Peter and Laura on October 23, 1928. On the next day, October 24, 1928, Peter and Laura signed a second agreement, also in Peter's handwriting under which:

" * * * additional stocks some of which, other than American Rolling Mill, may now be in name of L. S. T. (i. e. Laura S. Thomson) of a total value of seventy-five thousand dollars in a trust fund the income proceeds of which will be paid to Laura S. Thomson until our two children Anne and Laura Gamble Thomson shall reach the age of twenty-one years when the income will be divided between them. * * *"

A further document was executed by Peter G. Thomson, Jr., on April 2, 1929, which provided:

"In consideration of agreements made between me and Laura S. Thomson on October 23rd and 24th, 1929, respectively, I hereby further agree with said Laura S. Thomson that I will pay, from time to time as the same fall due, all school tuition and board bills of our daughters Anne Thomson and Laura Gamble Thomson, until they reach the age of twenty three (23) years respectively, conditional on schools selected being satisfactory to me."

On October 24, 1928, pursuant to the agreement aforesaid, Laura S. Thomson transferred to Peter G. Thomson the 4 & 5 Beach Crest Lane residence for $60,000.00 paid by Peter. This property had a stipulated value of $141,450.00.

Sometime after the agreements were signed in October, 1928, Laura's father, Frank H. Simpson, was apprised of the settlement agreements and the proposed pending divorce proceeding. He employed his own lawyer to represent Laura, and thereafter extensive negotiations between Laura's father and his lawyer and Peter, ensued. These negotiations resulted in a trust agreement dated April 6, 1929, which was divided into two trusts, the first being known as "Trust A" having a corpus of securities with an

agreed value as of that date of $188,000.-00, the income of which was to be payable to Laura for her life and the remainder to the daughters. The second trust, "Trust B" created for the benefit of their daughters, had a corpus of securities approximating $75,000.00 in value from which the income was payable to Laura until each daughter reached 21 years of age. Thereafter the income from such trust was to be paid by the trustee to the daughters.

Following the agreement, the securities were placed in escrow to be executed upon the granting of the divorce.

On February 21, 1929, Peter G. filed a petition for divorce in the Circuit Court of Orange County, Florida, at Orlando, charging Laura S. with desertion. On April 3, 1929, she filed her answer to the bill of complaint denying all of the allegations. The divorce proceedings were held up pending a determination by the attorney for Laura that all of the terms of the agreement with respect to the creation of the trust had been carried out.

On April 12, 1929, the divorce proceedings were referred to a general master for the taking of testimony. On April 13, 1929, the divorce was granted to Peter. Counsel for Laura was present at that time and stated that they desired to offer no testimony.

At the conclusion of the trial of this case to a jury, because of the factual questions presented by the evidence, the court concluded that it was not possible to submit it to the jury under instructions that would result in a general verdict that would be decisive of all of the questions of fact necessary to a determination of the questions raised by the parties. It was therefore determined that the vital questions should be submitted in the form of special interrogatories. Eleven such interrogatories were submitted to the jury and they returned the following answers:

(1) That the Trust Agreement of April 6, 1929 was created pursuant to an agreement between Peter G. and Laura Thomson dated October 23–24, 1928 and April 2, 1929.

(2) That the Trust Agreement dated April 6, 1929 was created in conjunction with the divorce granted to Peter G. on April 13, 1929.

(3) That there were extended periods prior to their divorce during which Peter G. remained separate and apart from Laura.

(4) That Peter G. failed and refused to have sexual relations with Laura S. from about 1920.

(5) That Laura S. did not refuse to have sexual intercourse with Peter G. from June 1926 through and until divorce in April, 1929.

(6) That the Beach Crest Lane residence, having a value of $141,450.00 did not belong to Laura S. and that the transfer of such residence did not result in benefit to Peter G. of $81,450.00 in accordance with the agreement between them dated October 23, 1928.

(6A) That Laura S. did transfer the residence at Beach Crest Lane to Peter G. in return for $60,000.00 pursuant to the agreement between them dated October 23, 1928.

(7) That Laura S. did receive substantial assets from others than Peter G. Thomson prior to their agreement of October 23, 1928; that included in such assets were: (a) A check for $100,000.00, (b) 1477 shares of Armco stock at an average value of $105.75 per share, totaling $156,192.75, and (c) 150 shares of Champion Fiber Company stock valued at $400.00 per share, totaling $60,000.00.

(8) That Peter G. and Laura S. negotiated and agreed upon a value of her support rights at the sum of $12,000.00 per year for the remainder of her life beginning at the creation of the Trust (Trust A) on April 6, 1929, plus an additional value of the yield from $75,-000.00 (Trust B) until each of the two daughters became 21 years of age.

(9) That immediately prior to April 13, 1929 Peter G. was possessed of substantial wealth including 3,591 shares of American Telephone & Telegraph Company common stock valued at approximately $787,793.58 in addition to the

assets transferred into the Trust dated April 6, 1929.

(10) That the securities transferred in trust on April 6, 1929 by Peter G. Thomson, Jr., for Laura S. Thomson were not the property of Laura S. Thomson.

(11) That the securities which were transferred in trust on April 6, 1929 by Peter G. to Laura represented a return of property taken from Laura by Peter.

In due time following the verdict, each of the parties submitted suggested Findings of Fact and Conclusions of Law, which were supported by briefs and oral arguments were heard. We are now confronted with the problem of applying the applicable law to the facts found by the jury and entering the proper judgment.

As heretofore stated, the plaintiffs contend that the trust in question, Trust Fund A, was a transfer for an adequate and full consideration in money or money's worth and therefore is the excepted case under § 2038(a) (2), Title 26 U.S.C.A. The defendant claims that this is not so in that § 2043(b) Title 26 U.S.C.A.[4] excludes from the realm of consideration the giving up of marital or property rights.

We find that § 2043(b) does not have this effect because of the way in which it has been interpreted. The Service itself has determined in E. T. 19, 1946-2 Cum.Bull. 166, that the right to support by a spouse, pursuant to a legal separation agreement or divorce decree, is an adequate and full consideration to the extent of the value of the right to support. Furthermore, the Tax Court has concluded in Estate of Glen v. Commissioner of Internal Revenue, 45 T.C. 323, (1966) that "* * * section 2043(b) should be limited in its application to the release of rights which accrue to a *surviving spouse*, upon the decedent's death, i. e. dower, curtesy or similar rights

in the property or estate of a deceased spouse."

■ Since we have already determined that the relinquishment of marital rights can serve as consideration, our next problem centers around the question of whether Laura gave up support rights and rights in her own property, and, if so, what is the value of those rights.

It is contended by the defendant that Laura gave up no rights because (1) the Florida divorce precluded her from obtaining alimony or property, citing Phinney v. Phinney, 77 Fla. 850, 82 So. 357 (1919) which in effect says that a wife against whom a divorce was granted had no support rights against a blameless husband, (2) that the plaintiffs are estopped from looking behind the divorce, and (3) that Laura had made a gift of her personalty to Peter.

The plaintiffs do not attack the validity of the Florida divorce, although it is their contention that it has no particular place in the determination of the rights of the parties under the trust agreements, and with that contention, I agree.

■■ The Florida divorce must be accepted as valid, although it is quite clear from the evidence that it was the result of collusion in that Peter at the time the divorce proceeding was filed was not a resident of Florida and that Laura had not deserted Peter, as was charged in the complaint and admitted by Laura. In fact, she was at that time living with their children in the family home provided by Peter in Cincinnati, and was being supported by him. However that is beside the question and need not be considered, except to say that Laura participated in whatever conspiracy there was for the purpose of obtaining a divorce and she could not thereafter attack the validity of the divorce or seek any support or property rights which

4. "Section 2043. Transfer for insufficient consideration

(b) Marital rights not treated as consideration.—For purposes of this chapter, a relinquishment or promised relinquishment of dower or curtesy, or of a statu-

tory estate created in lieu of dower or curtesy, or of other marital rights in the decedent's property or estate, shall not be considered to any extent a consideration "in money or money's worth."

were precluded by the granting of the divorce. See: Phinney v. Phinney, supra.

■■ We believe that if the facts as found by the jury had been before the Florida court in a contested case, or in a cross-bill, no divorce would have been granted to Peter. On the contrary, we believe that Laura would have been entitled to a divorce from Peter either under the laws of the State of Ohio, of which we take judicial notice,[5] or of Florida, of which we have been apprised and which are similar to those of Ohio, on the ground that he remained apart from her and refused to have sexual intercourse with her, as found by the jury, and that she would have received a very substantial sum by way of support and maintenance in addition to the return of her separate property which Peter had taken from her. This we feel is what a divorce court, whether such court be located in Ohio or Florida, being a court of equity, would have done after having considered the following facts:

That Peter and Laura moved in the highest strata of society in their community, that they entertained and were entertained by that group with which they were associated, that they took extensive trips in this country and abroad, that they lived in a fine home, that they were attended by servants in keeping with their station in life, and that Peter was wealthy and had the ability to pay.

The right to bring a divorce (or to contest a divorce if one were brought by Peter), the right to establish her marital rights, and the right to obtain the return of her separate property are the things which Laura agreed to relinquish, and

she made that agreement in 1928 at a time before the divorce and not after.

What Laura would have been entitled to if a divorce had been granted to her in Ohio, or what she would have been entitled to had she contested the Florida divorce, we do not know, although plaintiffs ask us to determine that question. However, considering all of the facts as shown by the evidence as we have heretofore recited them, and considering the further fact that Peter possessed wealth of approximately $1,500,000.00, i. e., $787,793.58 in AT&T stock, $141,450.00 the value of the home, and the value of the securities which went into the creation of the two trusts, as well as the property which had come into Peter's possession under the power of attorney from Laura S. it is reasonable to assume that an award of alimony and the return of her own property would have been in excess of $500,000.00

Defendant tells us that there is no substantial evidence as to the probable life expectancy of either party, although at the time the wife was 34 years of age, and that alimony is usually granted in periodic payments and ordinarily terminates upon remarriage. Admittedly, Laura remarried approximately six months after the divorce was granted in 1929. Nevertheless, we believe that whatever the alimony payments for six months would have amounted to, Laura would have received at least $316,192.75 free and clear, in that this figure represents her own separate property, property that the jury found had been acquired by Peter from her.

Defendant contends that Laura did not give up her right to the return of her separate property, because she had made

---

5. Section 11979: Courts of common pleas may grant divorces for the following causes: * * * 4, Impotency; 5, Extreme cruelty; * * * 7. Any gross neglect of duty; * * *
Section 11990: When a divorce is granted because of the husband's aggression * * * the court shall * * * allow such alimony out of her husband's property as it deems reasonable, having due

regard to property which came to him by marriage and the value of his real and personal estate at the time of the divorce.
Section 11991: Such alimony may be allowed in real or personal property, or both, or by decreeing to her such sum of money, payable either in gross or installments, as the court deems equitable.

a gift of it to Peter, and that she must show that she had a legal right to require its return.

Since we have already determined that a *court of equity* surely would have ordered the return of her separate property, it is not necessary to reach the question of whether or not she had a legal right to enforce its return. However, in passing over this question, we can say that we believe that such a right did exist at that time. See: Yocum v. Allen, 58 Ohio St. 280, 50 N.E. 909 (1898).

■ Furthermore, we are unable to find even a suggestion anywhere in the evidence of any intent on the part of Laura to make a gift of her securities or property to Peter at any time during their married life. She was an inexperienced young girl when she married Peter, and he was a successful experienced business man who simply took possession of her property and handled it in his own name under the power of attorney.

■ We have reviewed the decisions with respect to the evidence necessary to support a gift and with respect to any presumptions favoring a gift where the husband has reduced to possession the property of the wife, and conclude that the circumstances of this case do not suggest any intent to make such a gift nor did a presumption of a gift exist at that time. McLean v. Miller, 11 Ohio Cir.Ct.R.,N.S., 424 (1909).

■ Although the jury found that the Beach Crest Lane residence, having a value of $141,450.00, did not belong to Laura and that the transfer of such residence did not result in a benefit to Peter of $81,450.00, the plaintiffs contend that the transfer was a detriment to Laura and that consideration can be a detriment as well as a benefit. We find this argument to be without merit. The rule is well stated in Lowndes and Kramer, Federal Estate and Gift Taxes, Sec. 14.5, p. 302:

"It seems fairly certain that the consideration which will prevent a transfer from being taxable under the estate tax must not only be an adequate and full consideration in money or money's worth but a consideration which moves to the transferor,—that is, a consideration which takes the form of a benefit to the transferor, rather than a detriment to the transferee."

Furthermore, if the property did not belong to Laura, as was determined by the jury, how could it have been a detriment to her to transfer that which she did not own?

■ Since we have found that there was consideration given for the transfer in trust, there is no need for us to find it again by delving into an area which has thus far been studiously avoided. The area is § 2516, supra, of the gift tax; the problem is to apply it to the estate tax area; and the cases where this approach has been rejected are: Estate of Glen, supra; Estate of Keller, 44 T.C. 851 (1965); and Estate of Nelson, 47 T.C. 279 (1966).

This brings us to our next problem which is, at what time do we determine the value of the trust, at the time of its creation or at the time when Peter passed away? This, of course, makes a difference when that which Laura gave up is set against the value of the trust for purposes of determining whether it is "adequate and full consideration in money or money's worth".

■ Although the defendant contends that under the authority of § 2043 (a) supra, the trust should be valued at the date of Peter's death, with this we cannot agree. The agreement between Peter G. and Laura S. was entered into in 1928. Peter performed by setting up the trust in 1929. Laura performed by relinquishing her rights in 1929. Therefore, 1929 is the year that we should look to in examining the *quid pro quo.*

To look at the trust at a time after its creation when its value may have increased or decreased, as the case may be, would be objectionable primarily because it would not be a true reflection of the values in question. § 2043(a) supra, deals with partial consideration, and not full and adequate consideration. See: Estate of Nelson, supra, and the following therefrom:

"While the determination of includibility of the various interests is made as of the time of decedent's death, the analysis of whether decedent received 'adequate and full consideration' for any of such interests is made as of the time of initial transfer. We embark upon such analysis by examining, as of the establishment of the trust in 1945, the *maximum* which Helen might possibly have received and valuing that maximum and comparing it with the consideration paid as of that time.

Since we have found * * * that 'adequate and full consideration' was received for Helen's interests, there is no occasion for section 2043(a), dealing with transfers for partial consideration, to come into play."

As is above indicated, we must determine the maximum which Laura might possibly have received and compare it with the consideration that went from her to Peter. The maximum which Laura could have received is the value of a life interest in the $188,000.00, not the $188,000.00 itself because that was the corpus of the trust and she had no present or future right in that sum. Nor was the maximum $561,304.16, since we have already committed ourselves to the proposition that the trust should be valued as of the date of its creation.

The practical effect of the trust agreement was that for the sum of $12,000.00 per year during her lifetime, Laura released whatever rights she may have had against Peter either for support or rights in his property or the return of her own property, and as security for the performance of his obligation to pay the amount agreed upon, Peter set up the trust fund. She acquired no interest in the fund other than to be assured that the income therefrom would be paid to her in satisfaction of the obligation created by the contract. Peter alone could not revoke the guaranty of fulfillment, nor could it be modified or altered except by the concurrence of both parties.

At Laura's death the corpus of the trust fund would be distributed among Peter's designated heirs in accordance with the directions set out in the trust, so at most, at the time the trust was created, Laura had but a life interest therein. The consideration that she gave for that life interest was, as has already been pointed out, whatever may have been the value of that to which she may have been entitled had she sought and obtained her rights in a court of equity.

We must now place a value on that life interest which she acquired in 1929.

At the time the trust was established, Laura was 34 years of age. While the evidence does not reveal what her life expectancy may have been at age 34, we may take judicial notice of the United States Life Table published in 1936 by the Department of Commerce, Bureau of Census which has been generally accepted by the courts. According to the figures in that table, Laura had a life expectancy in 1929 of 36.58 years.

We may also take judicial notice of Estate Regulation 70 promulgated by the Treasury Department and in effect in 1929 and its method of computing the present worth of the future value of her interest in the trust fund.

Actually, Laura, the beneficiary of the trust was living at the time of the decedent's death and had collected the sum of $12,000.00 per year for 31 years or $372,000.00, but we must consider the obligation of the estate as of the time the trust fund was created, bearing in mind that Laura had no vested right in the fund except as it secured her right to the $12,000.00 per year for and during her lifetime.

To arrive at that value we may again resort to the Treasury Department's regulations, and by so doing it is revealed that the value at 34 years of age and her right to receive $12,000.00 per year for life is the result of multiplying 16.33503 by $12,000.00 which is $196,020.36. So, considered upon that basis, Laura exchanged property rights which we estimate at an amount in excess of $500,000.00 for an interest valued at $196,020.36, which certainly is "adequate and full consideration in money or money's worth". It is this amount which we believe should be deducted from the gross estate of the deceased for estate tax purposes.

It may be contended that the conclusion the court has reached with respect to this deductible amount would relieve the estate of the deceased from paying any tax on the first $196,020.36 leaving only the difference between $196,020.36 and $561,304.16 subject to the estate tax, and further, that the $196,020.36 will pass tax free to the decedent's heirs once Laura, the beneficiary, is gone. But such a contention we think is not sound.

Laura, at the time of Peter's death, had collected at least $372,000.00 at the rate of $12,000.00 per year. Had there been no trust fund guaranteeing the payment of this amount, Peter's estate would have been worth less by the amount of $372,000.00 at the time of his death. The same may be said with respect to the $196,020.36 which was the present value of the future interest Laura had in the trust fund. The estate would have been diminished by that amount at the time of Peter's death. Thus, whatever Peter gave up at the time the trust fund was created in satisfaction of the claim against him personally or against the estate, lessened the value of the estate to that extent.

Form of judgment entry in accordance herewith may be submitted within 20 days. If the parties are unable to agree upon a computation of the tax in accordance with the court's conclusion, then the matter will be referred to the Commissioner of Revenue for a determination thereof, and judgment will be entered in accordance therewith.